687 P.2d 1356

ALL AMERICAN REALTY, INC., an
Idaho Corporation,
Plaintiff-Appellant,

v.

Michael B. SWEET, an individual, and
Harold L. Ryan, an individual, and
Ryan and Sweet, a partnership, Defend-
ants-Third Party Plaintiffs-Respon-
dents.

No. 13135, 13323.

Supreme Court of Idaho.

July 24, 1984.

Rehearing Denied Oct. 10, 1984.

Jon N. Wyman, Michael Brady and
Terry R. McDaniel, of Brady, McDaniel &
Matthews, Boise, for plaintiff-appellant.

Jeremiah A. Quane and John Potter
Howard, of Quane, Smith, Howard & Hull,
Boise, for defendants-third party plaintiffs-
respondents.

HUNTLEY, Justice.

By this appeal we consider the duty of an
attorney, acting as closing agent pursuant
to Farm Home Administration (FmHA) reg-
ulations in a real estate transaction, to the

real estate broker, for failure of the attorney to pay the broker its commission as required by the escrow instructions.

All American Realty, Inc. was employed by David Smith to find a buyer for his ranch. All American found a purchaser in Alden Wilson, who with his wife entered into an earnest money agreement for the purchase of the ranch. The agreement provided, inter alia, that Smith pay All American a broker's commission of $13,000 from the proceeds of the sale.

The land was encumbered by a FmHA loan, which Wilson was to assume under the terms of the contract of sale. Controlling FmHA regulations require that an attorney or title insurance company act as closing agent in transactions involving FmHA loans. 7 C.F.R. 1807.1 (1976). Michael Sweet was the attorney designated to act as the closing agent, and as such received from FmHA a set of instructions to be followed in executing the closing together with a copy of the earnest money agreement. One of the instructions directed the payment of the real estate broker's commission in accordance with the earnest money agreement.

In the weeks following the execution of the earnest money agreement, both Smith and Wilson became dissatisfied with All American, believing that All American was not making a great enough effort to wind up the transaction. The closing was conducted by Sweet without All American's agent present. Viewing the evidence in the light most favorable to All American, as we are required to do in cases of summary judgment, we must accept All American's statement (disputed by defendants) that it never received notification of the closing date. At the closing, Sweet first made a check out with All American and Smith as joint payees, but both Smith and Wilson insisted that the check be made out only to Smith. Smith told Sweet that he had no

agreement with All American and that if the closing was not completed that day, that he would withdraw from the transaction. Sweet then made the check out to Smith only, and informed Smith and Wilson that they would have to settle up with All American. Smith subsequently refused to pay the commission to All American and All American filed this · action against Sweet and his law partnership. The trial court granted summary judgment in favor of Sweet, as well as awarding him costs and $7,000 in attorney fees, for one hundred forty hours work, defending the case through summary judgment.

■ As the designated closing agent under FmHA regulations, Sweet was acting in the capacity of an escrow holder.[1] In Am.Jur.2d *Escrow* § 16, the rule is stated:

> Where a person assumes to and does act as the depositary in escrow, he is absolutely bound by the terms and conditions of the deposit and charged with a strict execution of the duties voluntarily assumed. He is held to strict compliance with the terms of the escrow agreement; and he may not perform any acts with reference to handling the deposit, or its disposal, which are not authorized by the contract of deposit.

By failing to pay the broker's commission in accordance with the earnest money agreement, Sweet violated one of FmHA's express instructions and breached his duty as the depositary. He is therefore liable to All American for the losses it suffered due to his breach:

> Since the depositary is bound by the terms of the deposit and charged with the duties voluntarily assumed by him, the rule is that liability attaches to him if he improperly parts with his deposit. His breach of duty in this respect has been held to constitute conversion. If he violates instructions or acts negligently

---

1. Lest there be any doubt that Sweet was an escrow agent for the purposes of this transaction, we note that the FmHA Agreement to Pro-

vide Loan Closing Services, executed by Sweet, specifically terms the designated attorney (Sweet) as "escrow agent."

he is ordinarily liable for any loss occasioned by his breach of duty. 28 Am. Jur.2d *Escrow* § 18.

Accordingly, it was error for the trial court to grant summary judgment in favor of Sweet.

 The fact that the trial court awarded Sweet $7,000 attorney fees for an alleged one hundred forty hours of work in processing discovery and summary judgment appears to be unjustified. One hundred forty hours at an average 6.5 hours per day would compute to 21.53 days, or virtually an entire working month. Assuming the average lawyer works eleven months per year, that would equate to one-eleventh of an attorney's entire annual performance to process a relatively simple summary judgment. The trial court made no determination of the appropriateness of the fees under the standards of either I.R. C.P. 54(e) and the trial court erred in refusing to grant All American's request that the attorney be made to itemize his time spent.

The judgment of the trial court is reversed and remanded for further proceeding consistent herewith.

Costs to Appellant. No attorney fees.

BAKES and BISTLINE, JJ., concur.

BISTLINE, Justice, voting to reverse the summary judgment.

Agreeing with Justice Huntley and Justice Bakes that summary judgment in favor of the defendants was erroneously entered in this case, I am nevertheless unable to further agree with them that Mr. Sweet "is therefore liable to All American for the losses it suffered due to his breach." That is not to be understood as intimating a view that Mr. Sweet may not be liable; such is a matter to be hereinafter decided back in the trial court. The trial court will in the further proceedings now have the benefit of three new opinions from this Court, plus two earlier withdrawn opinions. That court will not necessarily be bound to adhere to the views set forth in the plurality opinion of Justice Huntley and Justice Bakes, but is also free to consider the views in the plurality opinion of Justices Shepard and Donaldson, and my views hereinafter expressed. In that way, on remand, the case will have the same posture as *Latham v. Garner*, 105 Idaho 854, 673 P.2d 1048 (1983).

The district court, the Honorable William E. Smith, observed that the issue which was first presented to him, and now to us, was one of first impression in Idaho. He stated the question as being "whether an attorney acting under instructions from his employers, as a closing agent in a real estate transaction, owes a special duty to third parties who are not his clients or employers but who have an interest in the real estate sale being closed." The defendant, of course, is the attorney Mr. Sweet, who by reason of his being an attorney qualified as a FmHA closing agent. The third party referred to by Judge Smith is here All American Realty which firm but for the involvement of federal funds, would have in all likelihood closed the transaction, and thereby would have been so positioned to protect its interest in the transaction, that interest being a claim to the $8,000 due balance allegedly due on a real estate broker's commission of $13,000. Judge Smith wrote an exhaustive opinion in reaching the conclusion that Mr. Sweet could not be held liable for the loss which All American Realty claims to have suffered in not receiving the balance of their commission. That opinion should be this Court's starting point.

In order to get the full flavor of the facts of this case, and its unusual and complex background, and to facilitate the writing of this opinion, there will be found attached hereto Appendix A, which is the written memorandum decision of Judge Smith, containing a statement of the material facts which he found to be uncontroverted, and his conclusions of law, together with his

rationale for reaching those conclusions of law. It is important to note that Judge Smith therein made a strong point which does not appear to be discussed in either of the plurality opinions:

"12. Smith and Wilson told Sweet that the original earnest money agreement was no longer in effect and that its provisions had been changed by agreement of the parties.

"13. The plaintiff has not sued Smith for the commission he allegedly owes it.

"14. The validity of the contract between Smith and All American has therefor never been judicially determined."

Judge Smith seemingly had in mind here that All American Realty was premature in attempting to hold Mr. Sweet liable for money which Mr. Smith allegedly owed to All American Realty. What was involved here was the usual form of earnest money agreement; essentially it was the broker writing up the buyer's offer to purchase, that offer signed by the buyers, and then presented to the sellers. It would become a binding contract when signed by the sellers. The form is so constructed that the sellers in affixing their signatures to it all at one fell swoop give their acceptance of the buyer's offer, and at the same time also obligate themselves to the broker to pay a commission, there being an appropriate blank to write in the amount of the commission. In this particular case the seller's acceptance signified their agreement to "the foregoing terms and conditions" of the proposed sale, and then constitutes their agreement "to pay the broker's commission thirteen thousand and no/100ths dollars, or five percent which the broker shall have the right to retain from the proceeds of this sale." Giving rise to this *litigation* was the fact that the earnest money offer was only $5,000, and the broker himself, due to the intervention of FmHA, did not retain sufficient funds on

hand from which to retain the total of $13,000. FmHA involvement precluded All American from closing its own sale transaction, All American being neither a title company nor a legal firm.

The signed agreement whereby Mr. Smith obligated himself in writing to pay a broker's commission of $13,000 would appear to make at least a prima facie case of liability against Mr. Smith, but, on the other hand, the affidavit of Mr. Sweet states that Mr. Smith told Mr. Sweet that he (Mr. Smith) owed his broker nothing and that he had no agreement with All American Realty. It further stated that Mr. Smith told Mr. Sweet that All American Realty "had no hold on any of the purchase money proceeds." The affidavit concludes with the statement that it was "at David B. Smith's instruction your affiant did not disburse any funds for the payment of a broker's commission to All American Realty." At this juncture it cannot be said that the district court was off track in the finding that there was no judicial determination that Mr. Smith owed All American anything.

Conclusions of law numbered 3 and 4 of Judge Smith's Memorandum Decision state:

"3. Since the plaintiffs have not yet sued the Smiths, and the alleged debt has not been adjudicated, there is no certainty that Sweet's actions have injured the plaintiffs.

"4. Because of the uncertainty of the injury the closeness of the causal connection between the defendant's actions and the plaintiff's injuries cannot be assessed."

Justices Shepard and Donaldson, in their plurality opinion, observe that "All American did not pursue its remedy against Smith, but rather filed this action against Sweet and Sweet's law partnership. Sweet and his partner then brought Smith into the action as a third party defendant. Smith was located and served in Nevada but has filed no appearance or answer."

All American has offered no explanation or reason for not accepting Smith as a defendant in its case for which reason on remand it would seem logical that an issue that ought to be resolved is Smith's obligation, if any, to All American. This Court, in my view, should be mindful of the district court's concern that the obligation of Smith to All American had not been determined. It would seem to be an issue which should necessarily not be determined in a proceeding which does not involve Mr. Smith. There is, of course, a considerable body of law which discusses the defenses which a client may have in resisting payment of a broker's commission. *See generally* Brokers, 12A Am.Jur.2d 765. The resolution of this issue would be one properly reserved for determination on remand.

An equally difficult issue in this case which is going to require resolution on remand is the exact status of Mr. Sweet. Judge Smith was of the view, as reflected in his Memorandum Decision, that Mr. Sweet was an attorney who was in the employment of both Mr. Smith and Mr. Wilson, and hence Judge Smith's conclusion that Mr. Sweet had no choice but to believe his own clients, and especially Mr. Smith, who told Mr. Sweet that All American had no more money coming out of the transaction. As Judge Smith stated in his conclusions nos. 7, 8 and 9:

"7. Sweet would have had to refuse to follow the instructions of his employers, withhold funds claimed by one of the parties paying his fee, and pay out funds to which his employer claimed a legal right without any apparent benefit to FmHA.

"8. Such actions would seriously interfere with the attorney/client relationship. *Defendant's actions (Mr. Sweet's) followed from his good faith acceptance of representation of fact made by his employers.*

"9. Imposition of liability in this case would impose upon Sweet a duty not otherwise cognizable at law, making him liable for negligent interference with plaintiff's contract (assuming Sweet's actions were negligent at all, and assuming the contract right, in fact, exists)." (Emphasis added.)

Judge Smith's views are entitled to considerable deference. Although his decision hinged to some extent on conclusions 3 and 4, conclusions 7, 8 and 9 appear to have been the more controlling. Beginning at the bottom of page 79 he discussed the right, in fact the obligation, of an attorney to believe the representations of his own client, citing two recent cases, one from Utah and one from Texas.[1] Both of those cases sustain Judge Smith's belief that "a court must consider an attorney's liability to third parties in the light of his client's representations and his right to rely upon them and his right to rely on them, and it would seem that liability will not extend to acts of attorney's relying in good faith upon their client's representations." R., p. 80–81. In disposing of the other possibilities of Mr. Sweet's liability to All American for the money allegedly owed it by Mr. Smith, Judge Smith accepted as a fact that Mr. Smith was indeed a client of Mr. Sweet, but nonetheless refused to accept the Cali-

1. "It is a general rule that the duties of the attorney which arise from the relation of attorney and client, are due from the attorney to his client only, and not to third persons. The latter have not retained or employed the attorney, nor has he rendered any services for them, at their request or in their interest. No privity of contract exists between them and the attorney. For such injuries, therefore, as third persons may sustain by reason of the failure or neglect of the attorney to perform a duty which he owed to his client only, they have no right of action against the attorney. [Citations omitted.]"

*Bryan & Ameidi v. Law,* 435 S.W.2d 587 (Tex.Ct. App.1968).
"In the usual case an attorney acts upon the information furnished by his client, in carrying out his work. As a general rule, an attorney is not required to investigate the truth or falsity of facts and information furnished by his client, and his failure to do so would not be negligence on his part unless facts and circumstances of the particular legal problem would indicate otherwise or his employment would require his investigation."
*Milliner v. Fox,* 529 P.2d 806 (Utah 1974).

fornia rule, or find it applicable to these facts and circumstances, and did not see attorney Sweet as standing in a fiduciary capacity to All American.

It is my belief that Judge Smith was incorrect in characterizing Mr. Sweet's relationship with Mr. Smith as that of attorney-client. In so stating I take note that the plurality opinion of Justices Shepard and Donaldson takes much the same view as did Judge Smith, declaring that: "The issue presented here is the duty, if any, owed to a real estate broker by an attorney acting as the closing agent in a real estate transaction." While it is true that Mr. Sweet was an attorney, and that he acted as the closing agent, more aptly put, the issue in actuality is the duty, if any, owed to a real estate broker by the agent appointed by the FmHA to close the real estate transaction which the real estate broker put together. In this particular case, the closing agent was able to qualify as a closing agent for the FmHA by reason of the fact that he was a licensed practicing attorney. Under the rules and regulations of the FmHA, however, it was not required that only attorneys would be approved and designated as closing agents. Those rules and regulations also provided that title insurance companies could so act, provided of course, that they, too, were approved by the state director of the FmHA. All American Realty's brief offered in support of its petition for rehearing at page 6 makes this illuminating statement:

> "Here it is very clear that either representing Farmers Home Administration as an attorney or as a closing agent the defendant Mr. Sweet did have an agreement between himself and Farmers Home Administration to provide certain services."

The brief goes on to immediately make reference to the federal regulations governing the qualifying requirements whereby attorneys can act as closing agents for the FmHA:

> " '(e) *Approval of attorneys.* The State Director is responsible for approving loan closing attorneys within his jurisdiction without any discrimination whatsoever. Any attorney who wishes to be approved should apply to the State Director on Form FmHA 427–14, *"Agreement to Provide Loan Closing Services."* This form must be properly completed and executed. The State Director will approve any qualified attorney who applies provided the attorney complies with the bonding and insurance requirements prescribed in § 1890t.2(a)(1)(i) and (iv) of this Chapter.' ... (emphasis added)."

7 C.F.R. § 1807.1(e).

It is important to refer to Judge Smith's third finding of fact: "The sale involved the assumption of a loan from the Farm Home Administration (FmHA) and, pursuant to its regulations, the FmHA appointed the defendant law firm to act as closing agent." This finding is correct; FmHA did appoint or designate the defendant law firm, Mr. Sweet, and his capacity was to act as closing agent. But FmHA did not purport to appoint him to act as and be attorney for either Mr. Smith or Mr. Wilson, respectively the buyer and the seller. Not only is it extremely doubtful that FmHA has any right or power to retain attorneys for private individuals under such circumstances as these, but FmHA did not do so. FmHA did, as All American's brief points out, appoint Mr. Sweet as a closing agent. It does not appear that FmHA retained him as an attorney, and it was only that qualification which entitled him to become its designated closing agent. The remarkable thing about this relationship between FmHA and Mr. Sweet is that Mr. Sweet—so far as can be ascertained from the record—acted entirely gratuitously on behalf of his principal—the FmHA! This little facet of the facts and circumstances had the potential for the confusion which here resulted when Mr. Smith told Mr. Sweet not to give any of the sale proceeds to All American.

The question which arises is how FmHA manages to hire closing agents without

compensating them, which will be more fully discussed *infra.* For now, it is sufficient to note only that FmHA assumes the right to dictate to people whose transactions involve its monies that they employ a designated FmHA closing agent.

Turning to Judge Smith's memorandum decision, it is readily apparent that his conclusions as to Mr. Sweet's non-liability were based upon the proposition that Mr. Smith was the client of Mr. Sweet, that is to say, that the relationship of attorney-client existed between them. Judge Smith's finding of fact no. 5, that Mr. Sweet's fee was paid by the Smiths and the Wilsons and that Mr. Sweet was considered to be representing the Smiths and the Wilsons and FmHA in the transaction is undoubtedly correct, but it is, as I said above, obvious from reading his entire decision that he considered Mr. Sweet as having been paid *attorney's* fees. In so approaching the task of resolving the cross-motions for summary judgment, Judge Smith was undoubtedly influenced by an affidavit of Mr. Sweet (apparently not drawn by Mr. Sweet, but by counsel representing him), which stated that Mr. Sweet "received from the buyer and seller of such transaction fees for legal services rendered in closing the subject transaction." R., p. 46. It probably does not do Judge Smith an injustice to surmise that he equated legal fees with attorney's fees, and hence, approached the question of Mr. Sweet's liability as being the liability of an attorney representing a client, and not the liability of a closing agent. As mentioned earlier in this opinion, Judge Smith relied upon the *Milliner* case from Utah for the proposition that an attorney is not required to investigate the truth or falsity of facts and information furnished by his client. That very case, however, on that very point, and in that very paragraph, opened with the statement that "the relationship of attorney and client is a confidential relationship *not* akin to that of accountant and client." 529 P.2d at 808 (emphasis added). For certain, Mr. Sweet was not an attorney engaged in that capacity by Mr. Smith, but rather was a closing agent, employed by both Mr. Smith and Mr. Wilson as closing agent—at the direction of FmHA. He was not performing services for them as an attorney. In that respect, however, it must be pointed out that prior to being designated as the closing agent for the transaction, he clearly had been engaged as an attorney in the services of Mr. Wilson. Mr. Sweet's affidavit filed in opposition to All American's motion for summary judgment, contains the following:

"That in the spring of 1976, the Defendants Ryan & Sweet were informed that Mr. and Mrs. Wilson, hereinafter referred to as the 'buyers' desired to purchase a ranch from Mr. and Mrs. Smith, hereinafter referred to as the 'sellers'. The sellers had arranged to have the Plaintiff, All-American Realty, act as the broker on their behalf.

"That initially, Defendants Ryan & Sweet did nothing to facilitate the closing of the sale, because they assumed that Plaintiff would proceed according to that end. With the passage of time, however, it became clear that Plaintiff was doing little to effect the transaction. At the buyers' insistence, Defendant Sweet began to assemble that which was required to bring the sale to a conclusion. *Thus, Defendant Sweet arranged to have the buyers place an amount approximately equivalent to the sum required to complete the transaction in a trust account, with Defendants acting as trustees thereof.* Communications by Defendant Sweet with representatives of the Plaintiff disclosed the various problems that are inherent in a transaction of this type. Such problems are customarily solved by the broker. Because of the Plaintiff's apparent lethargy with respect to the transaction, however, the Defendants were required to perform those acts normally performed by the broker. Specifically, Defendant Sweet, together with the buyer, Wilson, who is a certified public accountant, pro-rated all taxes on the subject land, pro-rated the interest on an FmHA mortgage, and pro-rated the interest on another mortgage that encumbered the property. Additionally, Defendant Sweet contacted the Internal Revenue Service and arranged to and did satisfy a Federal tax lien, arranged to and did satisfy a lien held by Consumers Co-Operative upon the land, and arranged to and did satisfy a judgment lien against the land held by a third-party. The Plaintiff did not participate in bringing the transaction to a conclusion.

"That around September 1, 1976, the Defendants received from the FmHA the loan-closing instructions ...."
R., p. 36.

The affidavit which Mr. Sweet signed was apparently based upon his deposition testimony, taken at the instance of All American Realty:

"Q. At the time of closing, then, you represented Mr. Wilson and his wife and Farm Home Administration at the same time; would that be fair to say?

"A. I would think that's a fair assumption.

"Q. Now, did you collect *legal fees* from both the sellers and the buyers as part of this closing?

"A. Well, I guess you would say so. It's part of the, we get our fee, they divide the fees, I guess you would say. So some of the money came from Smith's share and some came from Wilson." Sweet Deposition, p. 38.

It seems rather obvious from reading the above that fact that Mr. Sweet was correct in his assertion that his clients were Mr. Wilson and his wife and FmHA. When Mr. Sweet spoke of collecting "legal fees," in actuality he was discussing those fees which he collected from both Mr. Wilson and Mr. Smith for the closing of the transaction as an FmHA designated closing agent. Earlier on in that deposition Mr. Sweet made it crystal clear that he had indeed undertaken representation for Mr. Wilson when Mr. Wilson and his Montana attorney called at his office in connection with the transaction here involved:

"A. I think Mr. Wilson called and made an appointment and then he and Mr. Thompson came into the office.

"Q. Now, how was it that they came to your office? Do you know how they were referred?

"A. I have no idea.

"Q. And what was the purpose of that visit?

"A. They were upset at All American Realty. They had come from Montana. As I recall when they came in first it was in the latter part of July, and their purpose in coming was that they anticipated that it was going, that the whole transaction would be closed about that time and they were upset that nothing had been done on it.

"Q. What did they request that you *do?*

"A. First of all, they were—they asked me if they—if I felt that they had any kind of a cause of action against All American Realty. And we ended up in a considerable discussion and I don't know where that really led from there.

"Q. Did you take any steps after that?

"A. No.

"Q. You just simply had a consultation; is that correct?

"A. Yes, that's correct. Well, there were other things that were done as a result of—or there that day.

"Q. And what did you do?

"A. Well, they wanted, they expressed that they wanted to go ahead with the transaction with Mr. Smith, and we had a considerable discussion and Mr. Wilson, as evidence of his further good faith in the matter, wanted to deposit in our trust account and did deposit in our trust account a considerable amount of money. I think it was in the neighborhood of $75,000. And we went to First Security Bank, the three of us, and set up a special account, special trust account, in First Security Bank.

. . . .

"Q. Would it be fair to say that at the conclusion of that office call, that you initiated no office action per se, other than to set up the trust account?

"A. That's right, I did not.

"Q. When then was the next contact, sir?

"A. Oh, I would say within a couple of weeks after that Mr. Wilson started contacting me quite often. I mean, every couple of days after that.

"Q. For what purpose?

"A. For the purpose of advancing toward this closing date, or towards a closing date. He was doing quite a bit of work with the Farmers Home Administration to meet their requirement. I think Mr. Wilson came down to the area about that time and just started working, trying himself to get the thing closed up.

"Q. And from these various contacts that you had, did you do any office work or further contact either All American or the Farm Home Administration or Mr. Smith?

"A. Well, not for quite awhile. I had several communications with, or several conversations and so forth with Mr. Smith before I ever had any further contact at all with All American Realty.

"Q. What was Mr. Smith's—

"A. Mr. Wilson, Mr. Wilson.

"Q. Oh, I'm sorry. Would it be fair to say you didn't contact Mr. Smith until probably closer to when you went to closing?

"A. I didn't ever have a conversation with Mr. Smith until just, probably, a couple of days prior to closing."

Sweet Deposition, pp. 10–14 (emphasis added).

The foregoing establishes to my mind that on the record before us it cannot be said that Mr. Sweet was ever an attorney who had undertaken to act as an attorney representing Mr. Smith. Conversely, he was giving legal representation to Mr. Wilson, and, extremely important, Mr. Sweet had a considerable sum of Mr. Wilson's money in a special trust account. The record before us also establishes that Mr. Sweet, as FmHA's designated closing agent, took a fee from Mr. Smith and a like fee from Mr. Wilson for that service.[2] And, while it appears from the record that at closing Mr. Sweet continued in his legal representation of Mr. Wilson, and it was Mr. Wilson's money which reposed in the firm trust account, Mr. Sweet not only was not engaged in any legal representation of Mr. Smith, but on the contrary, appeared to be under an obligation to Mr. Wilson to bring the transaction to a conclusion. And did so. But, if he incurred any liability to All American, he was absolved therefrom on the view of the district judge that he was not at liberty to disbelieve Mr. Smith on the basis that the latter was his client. Hence, the grant of a summary judgment predicated upon that basis was reversible error.

In further proceedings upon remand, issues yet to be determined include establishing that Mr. Smith is indebted to All American, and the obligation, if any, of Mr. Sweet to pay from the Wilson trust monies All American's unpaid commission, especially in the absence of any written or oral direction from Mr. Smith to do so. Involved in that determination it may also be necessary to ascertain if any directions of FmHA to Mr. Sweet placed him under any legal obligation to pay over from the sale proceeds going to Mr. Smith the amount

which the latter denied owing to All American. All of these issues have to be measured in connection with Mr. Sweet's primary obligation to aid his client, Mr. Wilson, in closing the transaction. At the same time, whether Mr. Sweet acted prudently, properly, and without negligence in undertaking to handle the closing has to be measured against his undertaking the closing of the transaction where he was already employed and in the services of Mr. Wilson, and there was a possibility or probability that a conflict of interest might arise. In that regard, where he was supposedly "employed" by both Mr. Smith and Mr. Wilson to handle the closing—which was not a matter of their free choice, but done under the mandate of FmHA—it may be necessary to determine if he was in fact actually so employed by them, or rather retained as an agent for FmHA which in turn itself paid him nothing, but forced Mr. Wilson and Mr. Smith to "contribute" to Mr. Sweet the compensation for his closing services. And, in assessing any liability upon Mr. Sweet in favor of All American, it may be necessary to determine whether, because he is a licensed attorney and on that basis garnered fees for closing for FmHA, his obligation and duties in acting as a closing agent were any greater than would be the obligation and duties of a title company so acting.

In this particular case, where it appears, on this record as I read it, that FmHA was only able to interject itself into the transaction because the land involved was subject to a mortgage in its favor and its consent is apparently necessary, and where it further appears that it did *not* inject any new loaned monies into the transaction, it may very well be that, upon a full development of the facts, the relationship between Mr. Sweet and FmHA did not make Mr. Sweet a fiduciary as in an escrow arrangement. On the other hand, here it seems to be the fact that after Mr. Sweet began representing Mr. Wilson, Wilson, Smith and Wilson's Montana lawyer agreed that in the furtherance of the transaction Mr. Sweet in a special trust account would hold Mr. Wilson's money for ultimate delivery to Mr.

---

**2.** If there was any third party beneficiary in this entire transaction, as the earlier opinion of Justice Bakes suggested, the beneficiary was Mr. Sweet, and his benefactor was the Federal Government in the person of FmHA which agency takes it upon itself to "approve" (or

"appoint") agents to do its work, and compels other people to employ and pay them. Or, perhaps viewed otherwise, the beneficiary is the government—which obtains services and pays nothing.

Smith when the sale was fully consummated. Such an arrangement may be found to have made Mr. Sweet an escrow agent for both Wilson and Smith, as well as a fiduciary holding Mr. Wilson's money. But, remaining to be determined after the facts are established, is whether, under that arrangement and viewing it separately from the doing of the closing as FmHA's designated agent, there was any obligation or duty owing from Mr. Sweet to All American to pay out of those trust account funds monies which he appears to have known were, prima facie at least, owed to All American by Mr. Smith—absent any notice, which might or might not be required to be in writing, and which might or might not be required to be the equivalent of an outright assignment.

No matter what else takes place on remand I would like to believe that one of the parties would extract some testimony from FmHA officials which explains FmHA's justification for not directly handling closing transactions with its own officials, and further justifying the designation of agents which it does not pay but instead compels private individuals to employ and compensate.

I would also think that the Idaho Bar Association would refer to a proper committee the question of when, if ever, and on what conditions and under what circumstances, licensed attorneys, should enter into such relationships with FmHA.

SHEPARD, Justice, dissenting.

In my view, the basics of this case can be stated relatively simply. The Smiths, as sellers of the property, allegedly contracted with All American for the payment of a real estate commission for consummating the sale of property, and there is allegedly unpaid and owing All American some part of that commission. Farmers Home Administration, who held a mortgage on the property, designated Sweet as a "closing agent." While the majority designates Sweet as an escrow holder, it thereby errs. An escrow holder of necessity operates pursuant to a multiple party contract where each party to a transaction authorizes and directs the escrow holder to perform certain duties. Here there is absolutely no showing that the Smiths or the Wilsons were parties to any contract which required and directed Sweet to pay any moneys to All American. Likewise, there

is no showing that Farmers Home Administration had authority to determine that Smith owed All American any money; to say what amount of money was owed; or to direct payment of such alleged indebtedness. Since Smith had not authorized the payment of any money to All American, Sweet had absolutely no authority to make that payment absent such consent, and particularly over the protest of Smith. From the view of All American, at best, Sweet might have declared that the sale could not be closed, but in such case All American would have been in no better position than it is now in. I must further point out that the copy of the alleged earnest money agreement furnished to Sweet ·by Farmers Home Administration contained no signature by Smith and no statement of the alleged amount of real estate commission.

For some inexplicable reason, All American has not sought to have its claim against Smith adjudicated through an action brought against Smith. Rather, it sought in the instant action to assert its claim against Smith by its action against Sweet, thereby precluding the assertion of any defenses to its claim. As pointed out in the very well-reasoned opinion of the trial judge, since the Smith debt allegedly owed All American has not been adjudicated, and since All American has not brought an action against Smith, and the record contains no explanation for the absence of such an action, it is simply impossible on the state of this record to determine that Sweet's acts have in any way been harmful or detrimental to All American.

I reiterate that the "closing" in which Sweet participated was not an escrow. There is no showing that Smith, by any sort of contract, documentary or otherwise, authorized Sweet to pay any of Smith's money to All American. Again as noted by the trial judge, it would have been a breach of Sweet's fiduciary duty, as Smith's attorney, to pay Smith's money over to All American, contrary to the directions of Smith.

On the other hand, the record demonstrates no contract between All American and Sweet imposing a fiduciary relationship upon Sweet toward All American. As noted by the trial judge, the plaintiff asserted three theories of recovery before the trial court, only one of which is dealt with by the majority opinion. Not discussed are (1) that the plaintiff is a third party benefi-

ciary of an agreement between defendants and the Farmers Home Administration, and (2) that defendant, acting as an attorney, owes a duty of professional competence to the plaintiff, even though the plaintiff was not the defendant's client (malpractice theory).

All American argues that, regardless of the lack of privity between it and Sweet because of the lack of an attorney-client relationship, nevertheless a line of California decisions has established that privity is not a prerequisite to the recovery of a third party injured by an attorney in the negligent performance of his duty to his client. This Court has never adopted that reasoning of the California court and the instant case is not an appropriate one in which to so adopt that reasoning. Moreover, I disagree with All American's interpretation of those cases. While the California court did indeed abolish the necessity of privity between an attorney and third parties affected by the alleged negligence of an attorney in serving his client, those decisions only related to situations wherein an attorney was negligent in performing duties for a client in the drafting of a will of which the third parties were the clearly intended beneficiaries. *See Bucquet v. Livingston,* 57 Cal.App.3d 914, 129 Cal.Rptr. 514 (1976); *Heyer v. Flaig,* 70 Cal.2d 223, 74 Cal.Rptr. 225, 449 P.2d 161 (1969); *Lucas v. Hamm,* 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685 (1961), *cert. denied,* 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962); *Biakanja v. Irving,* 49 Cal.2d 647, 320 P.2d 16 (1958). The circumstances of the instant case are clearly distinguishable. There is no indication in the record that any of the instruments underlying the closing transaction were prepared by Sweet or that they resulted from his lawyer-client relationship with Smith and/or Wilson. The allegations of negligence here relate to Sweet's failure to distribute money to All American during the closing transaction. The record is clear that All American was not the intended beneficiary of Smith and/or Wilson. Rather, the record shows that the parties to the sale were adamant that All American should receive no moneys from the proceeds.

Although not discussed by the majority, I deem it necessary to also discuss All American's assertion that it is a third party beneficiary of a contract. It should be noted that there are various contractual relationships in the instant case. First, a direct contractual relationship exists between All American and Smith wherein All American contracted to perform certain services regarding the sale of Smith's property and Smith contracted to pay a commission to All American, *if All American performed those services.* The performance of those services is in dispute, the alleged indebtedness arising therefrom is not liquidated, and the amount, if any, of the alleged debt has not been adjudicated. Although defendants have brought Smith into the action by way of a third party defendant, All American has asserted no claim against Smith.

Secondly, a contractual relationship exists between Smith and Wilson for the purchase of the Smith property. Conceivably, All American could argue that it was an intended third party beneficiary of the Smith-Wilson contract, but All American has asserted no such claim against Wilson. In any event, such would not avail All American in its claim against Sweet, since Sweet was not a party to the Smith-Wilson contract.

Thirdly, there is an asserted contractual relationship between Sweet and the Farmers Home Administration. It is asserted that under that contractual relationship, Sweet was obligated to pay All American the unliquidated, unadjudicated debt allegedly owing All American from Smith. Wilson had contracted to pay Smith a certain sum. Farmers Home presumably was lending Wilson part of that money. To assert that Farmers Home could, over the protest of Smith, dictate to Sweet the disposition of Smith's money simply boggles the imagination. Absent Smith's consent, Farmers Home could confer no authority on Sweet to pay All American. While Farmers Home, under the instant circumstances, might have refused to participate, thereby blocking the sale, All American would have been in no better or worse condition than it is in at the present time. There is no showing that Farmers Home Administration objected to Sweet's action, nor is Farmers Home Administration a party in the instant case objecting that Sweet has breached his contract with Farmers Home Administration.

Assuming that the documents which Farmers Home Administration sent to Sweet constitute some evidence of a contractual relationship, nevertheless, All American does not occupy a third party beneficiary status here. Under traditional analysis, All American would have to be more than an incidental beneficiary and

would be required to establish itself as either a donee beneficiary or a creditor beneficiary of Farmers Home Administration, in order to claim a benefit under the contract. 4 Corbin on Contracts § 774 (1951). *See also Dawson v. Eldredge*, 84 Idaho 331, 372 P.2d 414 (1962). There is no assertion that Farmers Home Administration was indebted to All American and, therefore, it was not a creditor beneficiary. Likewise, All American was apparently not a donee beneficiary, there being no indication that Farmers Home Administration intended to or was authorized to, over Smith's objection, donate Smith's money to All American.

Even assuming that this Court has adopted § 133 of the Restatement (Second) of Contracts, and that the term "intended beneficiary" is substituted for the former concepts of "creditor" or "donee" beneficiary, *see Just's, Inc. v. Arrington Construction Co.*, 99 Idaho 462, 583 P.2d 997 (1978), there remains no showing that All American was an intended beneficiary of the alleged contract between Sweet and Farmers Home Administration. All American's right to payment, if any, arose from the contract between it and Smith, or perhaps from the contract between Smith and Wilson. If All American is an "intended beneficiary," it occupies that status only because of the contract between Smith and Wilson.

Whether a contract was intended by the parties to be for the benefit of a third person is a question of construction of the contract. *Davis v. Nelson-Deppe, Inc.*, 91 Idaho 463, 424 P.2d 733 (1967). Where, as here, the contract is clear and unambiguous, a determination of its meaning and legal effect are questions of law for determination by the court. *Beal v. Mars Larson Ranch Corp., Inc.*, 99 Idaho 662, 586 P.2d 1378 (1978). As found by the trial court, the alleged contract between Sweet and Farmers Home Administration contains no ambiguity such as would raise an inference that either Farmers Home Administration or Sweet intended the contract primarily for the benefit of All American. Clearly, the primary beneficiary of that alleged contract was Wilson, to whom Farmers Home Administration was loaning funds for the purchase of the property. *See Dawson v. Eldredge*, 84 Idaho 331, 372 P.2d 414 (1962).

*Just's, Inc. v. Arrington Construction Co., supra*, is of no avail to All American. In *Just's*, the third party beneficiary right arose from a provision of a contract between the City of Idaho Falls and a construction company, wherein it was agreed that the conduct of downtown businesses during construction would be allowed to continue without interference. Here, the right, if any, of All American arose by virtue of the contract between Smith and Wilson; it did not arise from the contract between Smith and Farmers Home Administration, under which All American would now claim a right as third party beneficiary.

In sum, the holding of the majority results in a procedural morass. All American attempts to sue Sweet for an alleged debt which Smith may or may not owe to All American. All American asserts no similar claim against Smith. Consequently, as held by the trial court, All American is unable to show in this action any damage arising from the conduct of Sweet. I suggest that the majority's ruling today distorts and confuses the duties and liabilities of *closing agents* in real estate transactions.

Lastly, as to attorney's fees, I would note that the cause was initiated prior to March 1, 1979, and, therefore, it was not required that the trial court make the findings presently required by our I.R.C.P. 54(e)(1). Attorney's fees were avoided pursuant to I.C. § 12–121, and I find no indication that the trial court decision was an abuse of discretion. *See Anderson v. Ethington*, 103 Idaho 658, 651 P.2d 923 (1982).

DONALDSON, C.J., concurs.