66 P.3d 221

BLAINE COUNTY TITLE ASSOCIATES,
Plaintiff,

v.

ONE HUNDRED BUILDING CORP.,
INC., a Maryland corporation; JSGACG
Trust; and Grubb and Ellis Commercial
Real Estate Services, Defendants.

JSGACG Trust, Plaintiff–Third Party
Defendant–Appellant,

v.

One Hundred Building Corporation, a
Maryland corporation, Defendant–
Respondent,

v.

Grubb and Ellis Commercial Real
Estate Services, Third Party
Claimant–Respondent.

No. 27202.

Supreme Court of Idaho,
Boise, March 2002 Term.

July 1, 2002.

Rehearing Granted Sept. 13, 2002.

Rehearing Denied April 3, 2003.

**518**

Stephen D. Thompson, Ketchum, for appellant.

Leroy Law Office, Boise; Givens Pursley, LLC, Boise, for respondent. David R. Lombardi argued.

TROUT, Chief Justice.

This case involves a dispute between two creditors claiming an interest in the proceeds from the sale of a hotel owned by One Hun-

dred Building Corporation ("the Corporation"). JSGACG Trust ("the Trust") appeals the district judge's decision awarding $135,000 in interpleaded funds to Grubb and Ellis Commercial Real Estate Services and Colliers Paragon, Inc. ("the Brokers").

## I.

### FACTUAL AND PROCEDURAL HISTORY

The Corporation is a Maryland corporation, which owned and operated the Pinnacle Inn located in Ketchum, Idaho. James S. Gibson is the president of the Corporation and his wife, Andrea, is the secretary.

The Pinnacle Inn was not a successful business venture, losing an average of $10,000 a month over a period of seven or eight years. In order to keep the Pinnacle Inn running, the Trust supported the Corporation by advancing money for payment of obligations and operating deficiencies of the business. The acronym JSGACG stands for James S. Gibson and his wife Andrea C. Gibson, the same people who own the Corporation. The Trust is a family trust created in 1981, naming James Gibson as the primary beneficiary, the Gibson children as secondary beneficiaries, and Andrea Gibson as the trustee.

Even with the funds from the Trust, the Corporation faced foreclosure from its lien holder, Bank of America. The Corporation also faced a lawsuit by Nick and Kathleen Gyurkey who were the former owners of the Pinnacle Inn.[1] Facing foreclosure and a lawsuit, the Corporation entered into an Exclusive Authorization of Sale with the Brokers in an attempt to sell the Pinnacle Inn.

On February 10, 1997, after failed attempts to find a buyer for the Pinnacle Inn, the Corporation filed for Chapter 11 Bankruptcy. Due to an administrative error, the bankruptcy proceeding was dismissed, but was reinstated once the error was discover-

---

1. The Gyurkeys initiated suit against the Gibsons alleging the Gibsons engaged in a fraudulent scheme to deprive them of their ownership interest in the Pinnacle Inn by transferring property to other Gibson entities. After more than four years of litigation the parties reached a settle-

ment, and entered into a Memorandum of Understanding to confirm the essential terms of their agreement. During the following year, however, the Gibsons failed to execute the final settlement documents as set out in the agreement.

ed. During this time, James Gibson, acting in his capacity as the Corporation's president, executed a promissory note in the amount of $902,782.66 and an accompanying deed of trust to Pinnacle Inn in favor of the Trust. It was also during this period that the Gyurkeys obtained a judgment in state court ordering the Gibsons to execute the prior settlement documents, which the parties had agreed to. After the administrative error was discovered, the bankruptcy judge determined that the transactions made during the dismissal period were void as violating the bankruptcy stay under 11 U.S.C. § 105(a).

The Corporation's bankruptcy was subsequently dismissed for a second time, but this time on the merits. After the second bankruptcy dismissal, Bank of America recommenced foreclosure against the Pinnacle Inn, scheduling the sale to take place December 2, 1997. Fearing that Bank of America's sale of the Pinnacle Inn would terminate his interest and the interest of the Trust, James Gibson continued his search for a buyer. He found Eagle Crest on his own as a prospective buyer for the Pinnacle Inn.

Two conditions were required in order for the Eagle Crest transaction to be successful. First, the sale of the Pinnacle Inn was required to be finalized prior to the Bank of America foreclosure sale. Second, the Trust's deed of trust had to be reconveyed to the Corporation, as Blaine County Title, the escrow agent handling the closing for the Eagle Crest transaction, refused to close the sale of the Pinnacle Inn unless there was clear title. To facilitate the transaction, Andrea Gibson signed a Request for Full Reconveyance on behalf of the Trust so clear title could be conveyed to Eagle Crest.

Prior to closing, the Brokers discovered the pending sale of Pinnacle Inn and faxed a "Notice of Commission" to Blaine County Title on November 25, 1997. The Pinnacle Inn was ultimately sold to Eagle Crest for $2,250,000, closing on December 1, 1997. Blaine County Title held back $135,000 in trust to cover the claimed realtors' fee.

The Brokers requested arbitration on January 27, 1998, pursuant to paragraph 6 of the Exclusive Authorization of Sale. On June 26, 1998, four days before the arbitration hearing was to begin, James Gibson confessed judgment against the Corporation in favor of the Trust in the Superior Court of the State of Washington. James Gibson then took this foreign decree (i.e. Confession of Judgment) and filed a Notice of Filing of Foreign Judgment in the Fifth Judicial District, Blaine County. He then sought and obtained a Writ of Execution for the $135,000 held by Blaine County Title. The Brokers in response filed a third party claim. Unable to decide which party to pay, Blaine County Title interpleaded the funds into the district court.

The arbitration was concluded on September 14, 1998, with a final award in the amount of $180,478.49 in favor of the Brokers. An Order and Judgment Confirming Arbitration Award was entered by the district court on April 26, 1999.

A bench trial was then held on September 29, 2000, to determine which party was entitled to the interpleaded funds. The district judge awarded the funds to the Brokers, concluding the Exclusive Authorization of Sale unambiguously provided six percent be paid at closing and the Corporation was, therefore, not entitled to the $135,000 after closing. The Trust now appeals the decision of the district court.

## II.

### STANDARD OF REVIEW

On appeal, this Court does not set aside findings of fact unless they are clearly erroneous. I.R.C.P. 52(a); *Carney v. Heinson*, 133 Idaho 275, 281, 985 P.2d 1137, 1143 (1999); *Marshall v. Blair*, 130 Idaho 675, 679, 946 P.2d 975, 979 (1997). Thus, if a district judge's findings of fact are supported by substantial and competent, although conflicting, evidence, this Court will not disturb those findings. *Marshall* at *id.* Additionally, this Court gives due regard to the district judge's special opportunity to judge the credibility of witnesses who personally appeared before the judge. I.R.C.P. 52(a); *Marshall* at *id.* This Court will not substitute its view of the facts for the view of the district judge.

*Marshall* at *id.* However, unlike the Court's review of the district judge's findings of fact, the Court exercises free review over the district judge's conclusions of law. *Id.*

## III.

## DISCUSSION

### A. The Trust has provided sufficient argument.

■ Initially, the Brokers contend counsel for the Trust has not provided argument or authority to support this appeal, asking this Court to disregard the Trust's issues raised on appeal.

In support of the Broker's contention, they cite *Young Electric Sign Co. v. State, ex rel., Winder,* 135 Idaho 804, 25 P.3d 117, 123 (2001), where this Court held "[a] party waives an issue cited on appeal if either authority or argument is lacking, not just if both are lacking." (quoting *State v. Zichko,* 129 Idaho 259, 923 P.2d 966 (1996)). However, this Court has held that an issue will be considered as long as argument is provided. *See State v. Zichko, supra.*

In this case, we find the issues raised by counsel for the Trust should not be dismissed for failure to provide argument or authority. Although the Trust's initial brief does not contain any citation of authority supporting its position, counsel did provide argument explaining why the district court erred in its award of the funds to the Brokers. Those arguments are sufficient to warrant consideration of the Trust's issues on appeal.

Additionally, the Trust has met this requirement through counsel's citation of authority in his Reply Brief. Therefore, we find the Broker's position without merit and will address the remaining issues on appeal.

### B. The district judge did not err in awarding the real estate commission to the Brokers.

The district judge awarded the $135,000 commission to the Brokers, but did not specifically address whether a commission was due and whether the commission should come out of the escrow proceeds. It seems he implicitly concluded the parties agreed the commission, if owed, should come out of the escrow proceeds.

With respect to a debtor's creditors, funds in the hands of a third person not subject to the claim of the debtor are not subject to attachment. 6 AM JUR 2d *Attachment & Garnishment* § 125 (1999). Thus, money deposited in escrow to be paid to the debtor upon the performance of a stipulated condition or in the event of a happening of an uncertain contingency cannot be reached by the debtor's creditors before performance of such condition or the happening of such contingency. *Id.*

The Trust argues the Corporation and Eagle Crest, as the parties to the closing for the Pinnacle Inn, never agreed to allow Blaine County Title to hold $135,000 pending the result of the claimed commission by the Brokers. Therefore, since the $135,000 should have originally gone to the Corporation, the Trust, as the next creditor in line, was entitled to receive that money.

■ The Seller's Escrow Instructions, however, dictate a different result. The escrow instructions directed Blaine County Title to pay or hold back proceeds from the sale of the Pinnacle Inn for the benefit of the Corporation's creditors. As the depositary in escrow, Blaine County Title was required to follow the escrow instructions given to it. Where a person assumes and does act as the depositary in escrow, he is absolutely bound by the terms and conditions of the deposit and charged with a strict execution of the duties voluntarily assumed. *All Am. Realty Inc. v. Sweet,* 107 Idaho 229, 230, 687 P.2d 1356, 1357 (1984). Such a person is held to strict compliance with the terms of the escrow agreement and may not perform any acts with reference to handling the deposit or its disposal which are not authorized by the contract of deposit. *Id.*

In the instant case, the instructions specifically identified the creditors to be paid, and the Brokers were identified as one of these creditors. The escrow instructions state:

Covering the property described above which you may deliver and/or record when you have collected for the undersigned Sellers the sum of $2,250,000 (Selling

Price) from which you are authorized to pay or deduct:

1. Balance of existing Deed(s) of Trust
2. Pay Demand of Chateau Drug
3. Pay Demand of United States of America/Internal Revenue Service
4. Pay Demand of Ringert, Clark Chartered
5. *Real Estate Commission of $135,000 to Collier's Paragon*
6. Title Insurance Premium, 1/2 of the escrow fee and usual recording fees.
7. Federal Express
8. Escrow Holdback of $100,000

(Emphasis added).

Therefore, by virtue of its own escrow instructions, the $135,000 was to go directly to the Brokers as payment for their commission, and the Corporation therefore did not have an interest to the $135,000 held by Blaine County Title and the Trust could not attach those funds.

It would be contrary to accepted business practices to say that the parties entered into an agreement for payments of the commission "at closing" but did not intend for the commission to be paid as a part of the sales proceeds. "At closing" is a term of art which implies that at the time the buyer and seller settle the amounts due and owing between them, it includes the payment of a real estate commission. *See Margaret H. Wayne Trust v. Lipsky*, 123 Idaho 253, 846 P.2d 904, 911 (1993) (adopting the general rule that a commission is earned at the time the transaction closes).

Conceivably, however, a situation could arise where the sales proceeds are not sufficient to pay off all existing liens plus the real estate commission. In such a circumstance, it is still contemplated that the parties will resolve it as a part of the escrow and closing, and it is not intended the commission be paid separately as between the seller and realtor.

Once the entitlement to the commission was resolved through the arbitrator's award, it automatically followed the commission should be paid from the proceeds from the sale (the interpleaded funds).

Based upon the foregoing, we find the district judge did not err in awarding the $135,000 to the Brokers.

**C. We decline to address the district judge's decision awarding attorney's fees and costs.**

The district judge awarded costs and attorney's fees in favor of the Brokers on February 6, 2001. However, the district court subsequently granted the Trust's request for an extension of time to file an objection to attorney fees and costs. In its Memorandum Decision and Order, the district court held "[t]his Court's Order Awarding Costs and Attorney Fees entered February 6, 2001 insofar as it relates to payment of costs and attorney fees by JSGACG Trust is set aside until objections of JSGACG Trust can be heard." There is nothing in the record indicating whether or not the attorney's fees issue has been resolved, or under what authority the award was made. Accordingly, we decline to address this issue.

**D. The Brokers are not entitled to costs and attorney's fees on appeal.**

The Brokers request attorney's fees on appeal pursuant to Idaho Code § 12–121 and I.A.R. 41. In order for an award of attorney fees to be appropriate on appeal pursuant to Idaho Code § 12–121, this Court must be left with the abiding belief that the appeal was brought or pursued frivolously, unreasonably, and without foundation. *Wooley Trust v. DeBest Plumbing, Inc.*, 133 Idaho 180, 187, 983 P.2d 834, 841 (1999). We do not believe that to be the case here, and therefore decline to award fees to the Brokers on appeal.

## IV.

## CONCLUSION

The district judge properly awarded the $135,000 withheld funds to the Brokers. We also award the Brokers costs but not attorney's fees on appeal.

Justices SCHROEDER, WALTERS and KIDWELL, concur.

Justice EISMANN, Dissenting.

Because I do not believe that we should uphold the judgment based upon a factual finding not addressed by the trial court and not supported by the evidence, I respectfully dissent.

In this case there was no issue as to whether the Corporation owed the Brokers the $135,000 commission. That issue was decided by arbitration. The only issue in this case was whether the Brokers were entitled to be paid that $135,000 out of the sale proceeds. Because the sale proceeds were property of the Corporation, and the Brokers had not acquired any lien on the proceeds, the Brokers would be entitled to payment from the proceeds only if the Corporation had so agreed. That is a factual issue. Indeed, it is the sole factual issue presented to the district court and the sole issue upon which the judgment below can be based. The district court, however, did not make any finding regarding this factual issue. The majority states, "It seems he [the district judge] implicitly concluded the parties agreed the commission, if owed, should come out of the escrow proceeds." We should not uphold a judgment where the sole factual finding upon which the judgment can be based must be implied on appeal. Furthermore, that "implicit" factual finding is not supported by the evidence.

The majority resolves this factual issue by finding that the Corporation agreed in the escrow instructions to pay the Brokers out of the sale proceeds. The majority states as follows:

> In the instant case, the instructions specifically identified the creditors to be paid, and the Brokers were identified as one of these creditors. The escrow instructions state:
>
> > Covering the property described above which you may deliver and/or record when you have collected for the undersigned Sellers the sum of $2,250,000 (Selling Price) from which you are authorized to pay or deduct:
> >
> > 1. Balance of existing Deed(s) of Trust
> > 2. Pay Demand of Chateau Drug
> > 3. Pay Demand of United States of America/Internal Revenue Service
> > 4. Pay Demand of Ringert, Clark Chartered
> > 5. *Real Estate Commission of $135,000 to Collier's Paragon*
> > 6. Title Insurance Premium,½ of the escrow fee and usual recording fees.
> > 7. Federal Express
> > 8. Escrow Holdback of $100, 000
>
> Therefore, by virtue of its own escrow instructions, the $135,000 was to go directly to the Brokers as payment for their commission, and the Corporation therefore did not have an interest to the $135,000 held by Blaine County Title and the Trust could not attach those funds. (Emphasis theirs.)

In making the above factual finding, the majority overlooks two things. First, the escrow instructions were not a list of the creditors to be paid. The instructions authorized Blaine County Title "to pay or deduct" the amounts listed. For example, the "Escrow Holdback of $100,000" was not a direction to pay anyone. It was authorization for Blaine County Title to deduct those funds—*to hold them pending* further authorization for payment. Second, the Corporation and Blaine County Title expressly agreed that Blaine County Title could retain custody of the $135,000, but they did not agree that such sum could be paid to the Brokers.

A few days prior to the closing, the Brokers threatened to sue Blaine County Title if it did not pay them the $135,000 commission out of the sale proceeds. Not wanting to be a defendant in a lawsuit, Blaine County Title decided that it would not close the transaction unless it could withhold $135,000 from the sale proceeds and retain it until either the Brokers and the Corporation agreed, or a judge decided, where it would be paid. If the sale did not close on the date scheduled, then the property would be sold at a foreclosure sale scheduled on the following day.

Four people testified at the trial. They were D. Blair Clark, counsel for the Corporation; James Gibson, president of the Corporation; Andrea Gibson, secretary of the Cor-

poration; and Daryl Fauth, President of Blaine County Title.

Andrea Gibson was present at Blaine County Title on Friday, November 28, 1997, to sign documents for the closing. On Monday, December 1, 1997, when the closing occurred, she was in her office in Seattle, Washington, where she communicated with James Gibson by facsimile machine. She testified that she did not believe the Brokers were entitled to a commission and did not agree to the holdback of the $135,000.

Mr. Thompson: Q. How did you react to being told about a commission?

Mrs. Gibson: A. I was incredulous.

Mr. Thompson: Q. Why?

Mrs. Gibson: A. Because they had had the property listed for some time, I saw nothing come forth from them at all. Jim went out and found a buyer and had a sale pending and I couldn't believe that someone else would get any money for that.

. . . .

Mr. Thompson: Q. Did you think a commission was owed?

Mrs. Gibson: A. No.

Mr. Thompson: Q. Did you, either in your capacity as secretary of 100 Building or as the Trust and creditor at the closing, consent to the hold back?

Mrs. Gibson: A. No, I did not.

Messrs. Clark, Gibson, and Fauth were present for the closing on Monday December 1, 1997, and they all testified about the agreement between the Corporation and Blaine County Title regarding the $135,000. They all testified that the $135,000 was to be held by Blaine County Title, not paid to the Brokers. Their testimony also showed that there was not an agreement to pay the Brokers from the sales proceeds, even if it were later determined that they were entitled to the commission claimed.

Mr. Clark, the Corporation's counsel, testified that the Corporation acquiesced in Blaine County Title's demand that it hold the funds until the dispute with the Brokers was resolved, but it did not agree that the funds could under any circumstances be paid to the Brokers. His testimony included the following:

Mr. Thompson: Q. Did you as the agent for 100 Building Corporation consent to a commission being paid that day?

Mr. Clark: A. No.

Mr. Thompson: Q. To your knowledge did Jim Gibson consent to a commission?

Mr. Clark: A. No. No, it wasn't a consent situation. It was a situation that Mr. Fauth basically said he was going to have to hold it back until evidently he got further instructions from his underwriter, because otherwise he couldn't close.

Mr. Thompson: Q. That was my next question. There was no consent to a commission—

Mr. Clark: A. No.

. . . .

Mr. Lombardi: Q. So you acquiesced in Blaine County Title Company holding the $135,000 until the dispute between the realtors and 100 Building Corporation was resolved so the closing could take place, correct?

Mr. Clark: A. The problem I'm having with your question is "until the dispute was resolved", because we never did agree to a withhold agreement. We agreed that—we acquiesced that Mr. Fauth could hold back the money. We didn't know at that time whether we were going to file suit against the title company or exactly what we were going to do.

. . . .

Mr. Thompson: Q. Did you testify that 100 Building Corporation agreed to do anything other than let Daryl Fauth and Blaine County Title hold onto those funds that day?

Mr. Clark: A. No. That's all we agreed to do.

Mr. Clark also testified that after the closing, counsel for the Brokers drafted two or three proposed contracts regarding the procedure for the disposition of the $135,000 based upon the outcome of the arbitration, but the Corporation did not agree to any of them.

James Gibson, the Corporation's president, testified that he did not agree that any portion of the $135,000 be paid to the Brokers. He only agreed that Blaine County Title could withhold the funds so that the transaction could close as scheduled. His testimony included the following:

Mr. Thompson: Q. Explain what happened there.

Mr. Gibson: A. [O]ur belief and our understanding was—and mine personally—was that this referred to a sum of money which I agreed with Daryl Fauth, we would allow to stay with him, but it was more to protect Blaine County Title, which I stated to Daryl Fauth, and certainly not for the benefit of the realtors. And there was no listing presented at that time, there was nothing but a letter noticing a commission due. And I didn't feel that the $135,000 should even be withheld, but Daryl told me that the underwriters said that's the only way they could close and issue the insurance.

. . . .

Mr. Thompson: Q. Was it your intention by allowing the title company to hold onto the money that day, to hold it in abeyance pending some arbitration proceeding?

Mr. Gibson: A. No. I didn't have a copy of the original listing agreement which referred to arbitration. I didn't know anything about arbitration at that point.

. . . .

Mr. Lombardi: Q. Did you understand on December 1, 1997, that Blaine County Title Associates and their underwriters would not insure the title for the Pinnacle Inn to Eagle Crest if JSGACG or 100 Building Corporation took the $135,000 that was claimed as a commission by the realtors?

Mr. Gibson: A. Mr. Lombardi, I'll answer the question as I think you intended it to be. Mr. Fauth told me that his underwriters or their attorneys would not allow him to close the escrow and would not issue the title insurance unless they held back $135,000.

Mr. Lombardi: Q. So was the $135,000 to be withheld on December 1st and then on December 2nd be available to be paid to JSGACG?

Mr. Gibson: A. I told Mr. Fauth that I would memorialize this in a memo to him and that I was not authorized to act on behalf of JSGACG Trust to withhold any moneys for the benefit of the realtors, nor would I as 100 Building Corporation do so because I did not have the funds to do so. And I did memorialize that with a memo to him a day or two later.

The final witness was Daryl Fauth, the vice president of Blaine County Title. He testified that to protect Blaine County Title, he would not close the sale transaction unless Blaine County Title had permission to withhold $135,000 from the sale proceeds.

Mr. Lombardi: Q. What was going to happen with the title insurance policy if the Gibsons and 100 Building Corporation, JSGACG, did not agree to the withhold?

Mr. Fauth: A. I can't speak for Stewart Title. . . . However, Blaine County Title was threatened with litigation, and quite frankly, I didn't want to drag the new buyer into any future litigation, so basically since we were threatened, we couldn't close without the withhold.

Mr. Lombardi: Q. So, it was one or the other: Close or withhold?

Mr. Fauth: A. Yes.

Mr. Fauth did not testify that there was any agreement that the withheld funds would be paid to the Brokers. He testified that Blaine County Title would hold the funds until either the parties agreed, or a judge ordered, who was entitled to them.

Mr. Lombardi: Q. What was your intent regarding how the withheld sum would be ultimately distributed?

Mr. Fauth: A. Basically I was hoping for an amicable resolution. That Colliers [Brokers] and the Gibsons would talk and negotiate some sort of resolution, and I was either going to do one of—I was going to disburse on two things: Direction from both Gibsons and Colliers, or a judge telling me what to do.

. . . .

Mr. Lombardi: Q. Did you explain to them [the Gibsons] that you would require either an agreement between them and the realtors or direction from a court before you would release the $135,000?

Mr. Fauth: A. Yeah, in a roundabout way. I didn't use those exact terms. I said that, you know, this money is going to have to be withheld out of this closing and we will hold it until we have resolution. That's basically what I said, until it's resolved.

Mr. Lombardi: Q. Did the Gibsons agree to that withhold on those conditions on November 28th 1997?

Mr. Fauth: A. They did. Actually—Let me take that back. They walked out and I believe they used kind of the weekend to think about it. They weren't happy, and I could see that, so I said, "This is where your option is." And so on Monday I believe that there was no further direction from anyone to tell me otherwise, so yeah, they did agree.

Mr. Lombardi: Q. Mr. Clark used the word acquiescence.

Mr. Fauth: A. Yeah. And it kind of puts— he also used the words I said, "You're going to do this." And I heartily disagree. I don't tell people what to do in their closings, they tell me what to do in their closings. And we're there to facilitate the transaction, not to tell them what they're going to do. So when Monday came there was no negotiation of the commission, there was no talk of reduction. Either side wasn't going to budge. So I said, "Well, here's what we've got. What do you want to do?" And so I was instructed to do this.

Mr. Lombardi: Q. So did you withhold the $135,000?

Mr. Fauth: A. I did.

The evidence was uncontradicted. The Corporation did not agree that the $135,000 could be paid to the Brokers. The Corporation simply agreed that Blaine County Title could withhold the $135,000 from the sale proceeds in order to protect itself from a lawsuit by the Brokers. The evidence does not support the majority's finding of fact that "by virtue of its [the Corporation's] own escrow instructions, the $135,000 was to go directly to the Brokers as payment for their commission." The evidence likewise does not support the majority's finding that "the parties agreed the commission, if owed, should come out of the escrow proceeds."

The majority also finds that the Corporation and the Brokers agreed in the listing agreement that the Brokers would be paid from the sale proceeds. The listing agreement provided that the real estate commission was "payable at the closing of escrow." The majority concludes, "It would be contrary to accepted business practices to say that the parties entered into an agreement for payments of the commission 'at closing' but did not intend for the commission to be paid as a part of the sales proceeds."

On September 10, 1993, the Corporation and the Brokers entered into the listing agreement, which they later extended several times through December 31, 1997. The listing agreement provided that the Corporation would pay a six percent commission, regardless of who procured the buyer, and that the commission was "payable at the closing of escrow." Neither the Brokers nor the majority point to any authority holding that the phrase "payable at the closing of escrow" means "payable from the sale proceeds at the closing of escrow." The majority supplies that interpretation, stating that it is consistent with "accepted business practices."

"Accepted business practices" are of no relevance unless they constitute a custom in the industry. Contracts are to be interpreted according to their terms, even if those terms are not in accord with accepted business practices. Assuming that the majority intends the phrase "accepted business practices" to mean "industry custom," evidence of custom in an industry is appropriate where there is an ambiguity as to a contract term and the evidence will be helpful in clarifying the ambiguity. *Perkins v. Highland Enterprises, Inc.*, 120 Idaho 511, 817 P.2d 177 (1991). Industry custom must be clearly proven, *Id.*, and it must be one that has existed for such length of time as to become generally known and practiced in the area in

question, or in reference to the particular business with which it is connected. *Commercial Ins. Co. v. Hartwell Excavating Co., Inc.*, 89 Idaho 531, 407 P.2d 312 (1965). Before a person can be bound by an industry custom, that person must have actual knowledge of, or have consented to, it, or the custom must be so general and universal that it can be presumed that the person had knowledge of it. 21A AM. JUR. 2D *Customs and Usages* §§ 18 & 19 (1998).

In the instant case, neither side offered any evidence as to any industry custom regarding the payment of real estate commissions from the proceeds of land sales. There was absolutely no evidence offered on this issue. The Brokers did not even argue there was an industry custom that real estate commissions are paid from the sale proceeds, nor did the district court so find. Assuming that the listing agreement is ambiguous and that the custom in the industry is admissible in this case to resolve that ambiguity, it is not appropriate for an appellate court to make that finding on appeal where no evidence was offered on the issue.

There is a distinction between when a real estate commission is earned and the source of the funds to pay that commission. Consistent with *Margaret H. Wayne Trust v. Lipsky*, 123 Idaho 253, 846 P.2d 904 (1993), the district court held that the Brokers' real estate commission was earned when the transaction closed. The district court did not address, however, the issue of the source of that payment. Whether or not the Brokers had a contractual right to payment of their commission from the sale proceeds was the only issue tried. The district court did not make any findings of fact on that issue, and I do not believe that it is proper for an appellate court to make that finding, especially when it must supply missing evidence in order to do so.

To ensure they were paid, the Brokers could have required James Gibson to sign the listing agreement, they could have included in the listing agreement a provision stating that their commission would be paid from the sale proceeds, or they could have offered evidence showing an industry custom to pay real estate commissions from the sale pro-

ceeds. They did none of those things, however, and I do not believe it is appropriate for this Court to correct those omissions on appeal. Therefore, I would vacate the judgment and remand this case for further proceedings.