[Civ. No. 36445. First Dist., Div. Two. May 3, 1976.]

BARBARA BUCQUET et al., Plaintiffs and Appellants, v.
DAVID LIVINGSTON, Defendant and Respondent.

916

COUNSEL

Noland, Hamerly, Etienne & Hoss and James D. Schwefel, Jr., for Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold and John B. Marchant for Defendant and Respondent.

OPINION

TAYLOR, P. J.—Barbara Bucquet, her husband Howard, and their children, who are the beneficiaries of an *inter vivos* trust, brought this action for legal malpractice against David Livingston,[1] an attorney who drafted the trust instrument for the settlors, Barbara's parents, for the

---

[1] The attorney was sued as attorney for the settlor, as well as a trustee of the trust.

purpose of minimizing all taxes payable on the death of both. This appeal is from a judgment on the pleadings in favor of the attorney as to the sixth, seventh and eighth causes of action[2] of the amendment to the complaint, on the basis of our opinion in *Ventura County Humane Society* v. *Holloway*, 40 Cal.App.3d 897 [115 Cal.Rptr. 464],[3] as well as a stipulation between the parties in open court.[4] The precise question before us is whether the allegations of the complaint state a cause for malpractice insofar as the attorney should have known about the provisions of Internal Revenue Code, section 2041, and advised the settlors of the potential tax consequences of the inclusion of a general power of appointment, and that this failure to advise the settlors of the adverse tax consequences of the retention of the power of appointment during George's life damaged the beneficiaries. As the amendment to the complaint alleged that on the death of George the full value of the trust, rather than merely a life estate, was taxed to Ruby, George's wife, for California inheritance tax purposes in the amount of $50,000, and Ruby also incurred additional federal and state gift taxes, as well as attorney's fees, we have concluded that the judgment must be reversed.

■ When a judgment has been rendered on the pleadings, the sole question on appeal is whether the complaint states a cause of action (*Burnand* v. *Nowell*, 84 Cal.App.2d 1, 2 [189 P.2d 796]; *Union F. M.* v. *Southern Cal. F. M.*, 10 Cal.2d 671, 673 [76 P.2d 503]). Accordingly, all of the allegations of the complaint must be taken as true (*Gill* v. *Curtis Publishing Co.*, 38 Cal.2d 273 [239 P.2d 630]). The pertinent facts, as appear in the amendment to the complaint and the record[5] before us may be summarized as follows:

[2]These causes of action alleged, in sum, that as a result of the attorney's negligent draftsmanship, the beneficiaries received a smaller portion than the settlors intended, and also sought attorney's fees.

[3]The order granting the judgment on the pleadings here was filed on November 29, 1974, only a few months after our decision in *Ventura*, dated July 23, 1974.

[4]The stipulation provided, in part, for the dismissal of the first five causes of action that were no longer in issue at the time of the motion for a judgment on the pleadings, as subsequently set forth in our summary of the facts below. However, we have, of course, included the facts alleged in the first five causes of action to the extent that they were incorporated by reference in the subsequently filed causes of action of the amendment to the complaint.

[5]As a motion for a judgment on the pleadings is confined to the face of the pleading under attack (*Buck* v. *Standard Oil Co.*, 157 Cal.App.2d 230, 233 [321 P.2d 67]) and to matters of which we may take judicial notice (*Kachig* v. *Boothe*, 22 Cal.App.3d 626, 630 [99 Cal.Rptr. 393]; *Alford* v. *Hesse*, 100 Cal.App. 66 [279 P. 831]), we take judicial notice of the stipulation of the parties and the interrogatories and answers to the interrogatories. As the answers to certain correspondence and the attorney's deposition had also been

In July 1961, the settlor employed the attorney to perform the services necessary for the review and planning of his estate, and that of his wife, with the object of minimizing and avoiding federal estate taxes and California inheritance taxes otherwise payable at the death of each of them. Thereafter, the attorney prepared a revocable *inter vivos* trust specifically designating the beneficiaries, and George paid the attorney his fees. Both George and the attorney intended that the trust would accomplish the following: 1) on George's death, one-half of the principal would be available to Ruby, and would qualify the marital half for the marital deduction, pursuant to the federal estate tax (Int. Rev. Code, § 2056); 2) the other (or nonmarital) one-half would be available to Ruby during her lifetime but would not be subject to any federal estate tax or state inheritance tax at her death, and would pass ultimately to the beneficiaries.

George and Ruby executed the separate trust agreements prepared by the attorney in 1961. Only George's agreement is in issue here as it provided for the marital deduction as to one-half of the total assets. As to the nonmarital one-half, the trust agreement provided that the net income was to be paid to George during his lifetime and, if she survived him, to Ruby. Upon the death of the last survivor, the net income was to be paid to their only child, Barbara; on Barbara's death, the trust corpus, after payment of $175,000 to Barbara's husband Howard, was to be divided among their children.

The trust included the following language in Article IX: "George, or after his death or adjudicated incompetency, Ruby, if she is living, shall have the power at any time, by an instrument in writing delivered to the Trustees, to modify, alter, revoke, or terminate this agreement in whole or in part. . . ." Thus, the entire trust was made revocable by George, or after his death, by Ruby.

George died on July 27, 1964. After George's death, Ruby as a coexecutrix of the estate employed the attorney to probate George's estate and to represent her in tax matters related to the probate of George's estate. The attorney was paid additional fees for these services. The attorney also failed to advise Ruby of the tax effect of the general power of appointment in her estate and of her ability to disclaim the power under the applicable federal and state laws. The attorney's

---

supplied to the beneficiaries, we also take judicial notice of these apparently undisputed documents that were quoted in the trial brief. (Evid. Code, § 452.)

professional relationship with Ruby continued until her death in September 1969.

After George's death, Ruby incurred California inheritance taxes on the nonmarital one-half as a consequence of her power of revocation. For tax purposes, she was treated as the owner of the nonmarital one-half of George's trust and not as a life tenant. The determination of the appropriate amount of California inheritance tax owed by Ruby also raised questions concerning the legal effect that the power of revocation would have upon Ruby's estate when she died. It became evident that the power of revocation in Ruby rendered the nonmarital one-half of the trust includable in her estate for both federal estate and California inheritance tax purposes. The record clearly indicates that George did not understand the tax consequences of the power of appointment and that the attorney corresponded with the state inheritance tax attorney as to the problems created by the power of appointment.

On March 21, 1969, Ruby executed a renunciation or disclaimer of the power of revocation in an attempt to prevent the nonmarital one-half from being included in her taxable estate. Ruby also assigned her life estate in the nonmarital one-half on the same date to make certain that none of the property in the nonmarital half of the trust would be included in her taxable estate for federal estate or California inheritance tax purposes. This assignment was executed because a substantial period of time had elapsed between the death of George on July 27, 1964, and Ruby's renunciation on March 21, 1969, and it was unclear whether the renunciation would be treated as effective or as a release.

Ruby died on September 18, 1969. The instant complaint was filed on August 10, 1970. As it was subsequently determined that Ruby's renunciation was effective and that the nonmarital one-half was not includable in her estate and passed to the beneficiaries free and clear, the parties to this action stipulated to the dismissal of the first five causes of action.

In addition to California inheritance taxes incurred by Ruby as the owner of the nonmarital one-half of the trust upon the death of George, Ruby incurred both federal and state gift taxes, allegedly a total sum of about $50,000, as a result of her renunciation of her power of revocation over the nonmarital one-half of the trust and the assignment of her life estate in the nonmarital one-half of the trust. Ruby also incurred

attorney's fees in the alleged amount of $3,750 to effect the renunciation and the assignment. The gift taxes and attorney's fees were paid after Ruby's death.

 On appeal, the attorney contends that: 1) George's intent was carried out since the record shows that the nonmarital one-half of the trust eventually passed free and clear of federal estate and California inheritance taxes to the beneficiaries; and 2) the gift and inheritance taxes and the attorney's fees paid were imposed on Ruby and were not chargeable to or paid out of the assets of the trust.

The attorney's first contention is based upon the stipulation in open court that the nonmarital one-half passed to the beneficiaries, free and clear, resulting in the dismissal of the five causes of action pertaining thereto. The attorney's contention, however, ignores the fact that the steps taken by Ruby that resulted in the gift tax liability were alleged to have reduced the corpus of the trust. In order to carry out George's intent, the instrument with Article IX, quoted above, could not stand. The attorney admitted that after George's death, the power of revocation resting in Ruby as a result of Article IX would have subjected the nonmarital one-half of the trust to both federal estate and state inheritance taxes, if Ruby had not taken remedial steps of renouncing her general power of appointment and assigning her life estate. The beneficiaries allege that as a result of these remedial actions forced upon Ruby by the negligent drafting of Article IX, the value of the trust and Ruby's estate were reduced so as to also reduce the share of the beneficiaries by the amounts of the additional state inheritance and federal gift tax payments, as well as the attorney's fees.

The attorney's second contention on appeal that the damage complained of was suffered by Ruby and not chargeable or paid out of the trust assets, ignores the posture of the instant matter. As indicated above, on our review of a judgment on the pleadings, all matters asserted in the complaint must be taken as true (*Gill, supra,* at p. 275).

The attorney's third and major contention is that even assuming payment of the taxes and the attorney's fees from the trust assets, he had no duty to the beneficiaries sufficient to establish liability and that the judgment on the pleadings was properly granted on the basis of our opinion in *Ventura* v. *Holloway, supra.* As we said in *Ventura,* at page 902: "The elements of a cause of action for professional negligence are, of course, well defined. These ingredients are: (1) the *duty* of the

professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise; (2) *breach of* that *duty;* (3) a *proximate causal connection* between the negligent conduct and the resulting injury; and (4) actual loss or *damage* resulting from the professional negligence [citations]. When these elements coexist, they constitute actionable negligence. On the other hand, absence of, or failure to prove, any of them is fatal to recovery. This applies especially to the all important element of duty."

 We also indicated, at page 903, that an attorney, by accepting employment to give legal advice or to render legal services impliedly agrees to use ordinary judgment, care, skill and diligence in the performance of the tasks he undertakes (*Moser* v. *Western Harness Racing Assn.,* 89 Cal.App.2d 1, 7 [200 P.2d 7]). This duty extends not only to the client, but also to the intended beneficiaries; a lack of privity does not preclude the testamentary beneficiary from maintaining an action against the attorney on either a contractual theory of third party beneficiary or a tort theory of negligence (*Heyer* v. *Flaig,* 70 Cal.2d 223 [74 Cal.Rptr. 225, 449 P.2d 161]; *Lucas* v. *Hamm,* 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685]; *Biakanja* v. *Irving,* 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]). Liability to testamentary beneficiaries not in privity is not, however, automatic. All of the authorities indicate that a determination whether liability exists in a specific case is a matter of policy and involves the balancing of various factors, including: 1) the extent to which the transaction was intended to affect the plaintiff; 2) the forseeability of harm to him; 3) the degree of certainty that the plaintiff suffered injury; 4) the closeness of the connection between the defendant's conduct and the injury suffered; 5) the moral blame attached to the defendant's conduct; and 6) the policy of preventing future harm (*Biakanja* v. *Irving, supra,* p. 650; *Lucas* v. *Hamm, supra,* p. 588; *Ventura, supra,* p. 903).

An attorney may be liable to testamentary beneficiaries only if the stated test is fully met, that is, if due to the attorney's professional negligence the testamentary intent in a legal instrument is frustrated and the beneficiaries clearly designated by the testator lose their legacy as a direct result of such negligence (*Ventura, supra,* at p. 903).

In *Lucas, supra,* our Supreme Court concluded that "intended beneficiaries of a will who lose their testamentary rights because of failure of the attorney who drew the will to properly fulfill his obligations under his contract with the testator may recover. . . ." (P. 591.) Similarly,

in *Heyer* v. *Flaig, supra,* at page 229, where an attorney failed to inform a testatrix of the legal effect of her intended marriage and as a consequence her daughters lost their legacies, the court saw a clear duty running to the intended beneficiaries, the daughters, and held that "public policy requires that the attorney exercise his position of trust and superior knowledge responsibly so as not to affect adversely persons whose rights and interests are certain and foreseeable." These principles are equally applicable to *inter vivos* trusts, like the instrument here in issue, as there is no rational basis for any distinction.

 Arguably, the provisions of the Internal Revenue Code and applicable regulations on the subject are as much of a "technicality-ridden legal nightmare" as the California law on perpetuities, involved in *Lucas* v. *Hamm, supra,* at page 592. However, the marital deduction trust, such as the one drafted in the instant case, is one of the best known estate planning devices. Its details and tax consequences are all the more significant for a California attorney since it is well known that the original Internal Revenue Code amendments permitting marital deduction trusts were enacted to make available to residents of noncommunity property states certain tax benefits enjoyed by residents of community property states, such as California. Further, the pertinent provisions of Internal Revenue Code section 2041 making taxable for federal estate tax purposes a general power of appointment created after October 21, 1942, were first enacted in 1951,[6] 10 years before the trust instrument here in issue was drafted. There, provisions were incorporated into Internal Revenue Code section 2041 in 1954 (68A Stat. 385, ch. 736, effective Aug. 16, 1954), seven years before the trust instrument here in issue was drafted. The potential consequences of the retention of a general power of appointment are a matter within the reasonable competence of an attorney. Although the question of whether the precise language creates a general power is a matter of federal law (*Ernest & Mary Hayward Weir Found.* v. *United States,* 362 F.Supp. 928, affd. 508 F.2d 894),[7] the creation of general and special powers of appointment is also a significant aspect of the law of trusts and estates, apart from any tax considerations. Further, as indicated above, the complaint alleged

---

[6]Section of the Powers of Appointment Act of 1951, Public Law 58, 82d Congress, enacted June 28, 1951, amending what was then Internal Revenue Code section 811(f), the predecessor of Internal Revenue Code section 2041, which was enacted in 1954.

[7]The case held that since local law determines the right to inherit property, the federal courts will look to state law to determine the attributes of a power of appointment. Federal law, however, defines whether a power is "general," regardless of state terminology.

that the beneficiaries here also incurred federal and state gift taxes, as well as California inheritance tax consequences that could have been avoided by proper draftsmanship.

While the record indicates that the attorney was acquainted with certain provisions of the Internal Revenue Code, it also shows that he apparently overlooked the potential interpretation of the language of Article IX as a general power of appointment. His letter to George dated January 16, 1962, specifically referred to "certain assets over which Ruby retained full control and are not in the trust." He admitted that he could not remember whether at the time of his correspondence with the state inheritance tax attorney after George's death, he was aware of the position of the state agency as to the tax consequences of Article IX.

Here, it is alleged that the attorney was employed to plan George's estate and attempted to carry out George's intent that the nonmarital one-half of the *inter vivos* trust principal would ultimately pass to the beneficiaries, free of the burden of federal estate tax and California inheritance tax after Ruby's death. The attorney did so by applying a well established tax saving device, the marital deduction trust.[8] Thus, the 1961 transaction between George and the attorney was directly intended to affect the beneficiaries and the avoidance of federal estate tax and state inheritance tax was directly related to the amounts that George intended the beneficiaries to receive after Ruby's death.

The inclusion of Article IX with language that could be interpreted as a general power of appointment necessitated Ruby's renunciation and transfer of her life estate that led to the reduced beneficial attributes of the marital deduction device. Thus, the damage to the beneficiaries in the event that the power continued after George's death was clearly foreseeable and became certain after he died. Without these necessary remedial steps, the entire value of the nonmarital one-half of the trust would have been included in Ruby's estate and would have been subject to federal estate and California inheritance taxes. As the complaint alleged that the trust corpus, as well as the estate of Ruby, was reduced by the error in draftsmanship, we must assume, for the purposes of this appeal in its present posture, that the beneficiaries lost an ascertainable portion of their testamentary rights because of the attorney's failure to

---

[8]We think this aspect of the case distinguishes it from an area of complex law and circumstances that call for difficult choices among possible courses of action and procedural steps that we held not actionable in *Banerian* v. *O'Malley*, 42 Cal.App.3d 604, 613 [116 Cal.Rptr. 919].

advise either George before his death or Ruby after, that a general power of appointment was created by Article IX. We think under the above cited authorities, the beneficiaries have stated a cause of action. Of course, the facts as alleged may not be proved in a trial on the merits: for example, the attorney may be able to show at a later time either that the trust assets were in fact not diminished by the imposition of the additional taxes and attorney's fees, or that George and Ruby were advised of the potential consequences of Article IX, but chose to ignore these for other and more important family reasons.

Any reliance on *Ventura* is misplaced as that case is readily distinguishable on its facts. There, the alleged error was an ambiguous designation of the beneficiaries. The beneficiaries, however, were designated exactly in the manner specified by the testator—who apparently did not know that there were several charitable organizations that fit the description he provided to his attorney. Litigation ensued to determine which charitable organizations designated as organizations were the intended beneficiaries of the testator's bequest. After the conclusion of this litigation, one of the parties to the litigation brought suit against the testator's attorney for damages incurred in establishing its right to receive a share of the bequest. We held that the attorney had no duty to investigate and make specific the ambiguous designation of the charitable organization supplied to him by his client. We noted that imposing such a burden on the legal profession would amount to a requirement that an attorney draft litigation-proof documents. (*Ventura, supra,* at p. 905.) Aside from this consideration, we also held, as a matter of law, that the beneficiary organization was precluded from recovery as: 1) the trust purpose was clear and could be fully implemented since the testamentary intent was carried out and the beneficiaries under the residuary clause got their full share; and 2) the complaint was "utterly devoid of any indication as to what the true intention of the testator . . . was. . . ." (*Ventura, supra,* at p. 906.) Focusing on this omission in the complaint, we continued at page 906: "It is obvious that in the absence of an allegation that the testator did intend to leave a part of his residuary estate to appellants specifically, it cannot be determined with any degree of certainty that appellants suffered harm or injury at all."

In the instant case, of course, there was no ambiguity, either as to the tax saving intent of George or of the identity of the beneficiaries. In *Ventura,* we were concerned with establishing a precedent that would force attorneys to draft litigation-proof documents. Since in the instant

case the intent and beneficiaries were specified and the beneficiaries were to receive certain assets, it can be determined to what extent they were damaged, if the allegations of the complaint can be proved.

Of course, here, no less than in *Ventura,* can we demand of attorneys an impossible duty and a standard of care that requires litigation-proof documents. Nor, despite the recent recognition by our State Bar of taxation as a certifiable specialty, are we prepared to hold that an attorney engaged in estate planning has a duty to seek the advice of a certified tax specialist. As we have indicated in *Ventura, supra,* at page 903, balancing of all of the relevant factors is essential. Here, we may take judicial notice of the outstanding reputation for integrity and competence during the long career of the sole practitioner (now retired) who was the attorney for George and Ruby in the instant case, and the amendment to the complaint alleges no conduct to which any moral blame can be attached. We are not aware of any cases or guidelines establishing in a civil case[9] a standard for the reasonable, diligent and competent assistance of an attorney engaged in estate planning and preparing a trust with a marital deduction provision. We merely hold that the potential tax problem of general powers of appointment in *inter vivos* or testamentary marital deduction trusts were within the ambit of a reasonably competent and diligent practitioner from 1961 to the present. Our recognition of the existence of a cause of action in the instant case also advances the judicially approved policy of preventing future harm and the standards of the legal profession, a matter that has been of great concern in recent years, both to the general public and to the profession, as well as the courts (Evid. Code, § 451, subd. (f)). Arguably, the interests of a beneficiary are even greater than those of the testator or settlor. After the death of the testator or settlor, a failure in the scheme of disposition works no practical effect except to deprive his intended beneficiaries of the intended bequest. The executor of an estate has no standing to bring an action for the amount of the bequest against an attorney who negligently prepared the estate plan since, in the normal case, the estate is not injured by such negligence, except to the extent of fees paid; only the beneficiaries suffer the real loss. Thus, the fact that Ruby's estate was not a party is of no significance here. Unless the beneficiaries can recover against the attorney, no one could do so and the

---

[9]The only pertinent case our research has disclosed is *United States* v. *DeCoster,* 487 F.2d 1197, where Justice Bazelon of the District of Columbia Circuit Court of Appeals attempted to set forth minimum standards for the effective aid of counsel in a criminal case.

social policy of preventing future harm would be frustrated (*Heyer* v. *Flaig, supra,* p. 228; *Lucas* v. *Hamm, supra,* at p. 589).

Reversed.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied June 2, 1976, and respondent's petition for a hearing by the Supreme Court was denied July 1, 1976.