No. 63,261

HERBERT PIZEL, *et al.*, *Appellants/Cross-Appellees,* v. EUGENE P. ZUSPANN, *et al.*, *Appellees/Cross-Appellants.*

(795 P.2d 42)

Opinion filed July 13, 1990.

*Stephen B. Rhudy*, of Rhudy & Bradford, Chartered, of Lawrence, argued the cause and was on the briefs for appellants/cross-appellees.

*Mark A. Buck*, of Davis, Wright, Unrein, Hummer & McCallister, of Topeka, argued the cause and was on the brief for appellee/cross-appellant B.E. Whalen.

*Michael E. Francis*, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, argued the cause and was on the brief for appellee/cross-appellant Eugene P. Zuspann.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a legal malpractice action brought by the potential beneficiaries of an inter vivos trust of Charles Pizel, deceased, against the defendants, attorneys Eugene P. Zuspann and B.E. Whalen.

Prior to trial, defendant Zuspann's motion for summary judgment was granted. Plaintiffs appeal this decision. The claims against defendant Whalen proceeded to a seven-day jury trial. The jury assessed fault at 60% to the appellants and Charles Pizel, 35% to defendant Whalen, and 5% to defendant Zuspann. Damages of $204,550 were awarded to appellants, which were reduced to the percentage of fault of Whalen, resulting in a judgment totaling $71,592.50. The trial court overruled plaintiffs' post-trial motions, from which plaintiffs appeal. The defendants cross-appealed the district court's ruling that nonclients may sue for negligence and that the claims were not barred by the statute of limitations. This court granted defendants' motion to transfer to the Supreme Court for final disposition pursuant to Supreme Court Rule 8.02 (1989 Kan. Ct. R. Annot. 39) on March 27, 1989.

Charles Pizel was a single man who owned and farmed over 1,760 acres of farm land in Sherman County, Kansas. He died in April 1979. The appellants here are three nephews of Charles

Pizel. Allen lives in Colorado, where he owns and farms 2,700 acres of land. Allen's brother, Wilfred, also known as Bill or Billy, died after Charles and after the trust Charles created had been set aside by the Court of Appeals. Herbert, or Herb, is a farmer living in Kansas and the cousin of Allen and Wilfred.

Herbert Pizel had seven brothers and sisters, who were also nieces and nephews of Charles Pizel, but who were not mentioned in Charles' trust. Along with Herbert, they were named as residuary beneficiaries in Charles' will. These seven brothers and sisters sued Herbert, Allen, and Wilfred to quiet title to the land contained in the trust and won in *Pizel v. Pizel*, 7 Kan. App. 2d 388, 643 P.2d 1094, *rev. denied* 231 Kan. 801 (1982). The land in the trust was sold, and the proceeds were divided among the residuary legatees.

Eugene P. Zuspann is an attorney at law who has practiced law in Kansas since October 1939. For several years prior to 1962, Zuspann did Charles' taxes. In late 1961 or early 1962, Charles went to Zuspann to have him draft a contract of sale to transfer his 1,760 acres of land to Allen and Wilfred, who accompanied Charles. At this first meeting, Zuspann suggested a trust to accomplish what Charles wanted and provided a form on revocable trusts for Charles to read. Charles met with Zuspann several times over the next two months to discuss and prepare the trust, with Zuspann explaining that Charles would be deeding his property away to the trustees. Zuspann advised Charles that the trust could be canceled at any time to get the land back. Charles signed the trust on May 23, 1962. The same day, Charles executed a will and a deed conveying all his real estate to the trust. At that time, Zuspann believed Charles understood what he was doing and that he intended to create a trust. Zuspann represented Charles in this matter, not Allen or Wilfred. Zuspann believed a potential conflict of interest existed in advising Allen or Wilfred about their rights under the trust.

The trust named Charles, Allen, and Wilfred as trustees. Zuspann explained to Charles and Allen that the trustees owned the property, should manage it, and had the right to deal with the property as owners. No one, including Charles, ever asked Zuspann to change the trust after it was executed in 1962.

In 1962, Zuspann was involved in a law partnership with B.E. Whalen. Whalen was not involved in the preparation of the trust or estate plan or will in 1962. Whalen began representing Charles in the early 1970s. When he took over as Charles' lawyer, Whalen believed Allen, Wilfred, and Charles understood that the land was in trust, that the income from the land went to Charles, and that they had responsibility as trustees to take care of the land. The trust had been in effect for ten years and Whalen assumed Allen and Wilfred knew of their roles as trustees because they were involved in running the land and helped Charles with his affairs. Based upon his experience with Zuspann, Whalen believed the trust and the duties of the trustees had been explained to Charles. About 1972, Charles indicated to Whalen his belief that Allen, Wilfred, and Herb were in charge of the land. When Whalen, after looking at the trust documents, told Charles that Herb was not involved, Charles indicated his desire to have Herb named a trustee. Whalen prepared an amendment to the trust that included Herb as a trustee, and he discussed the proposed amendment with Charles. This was Whalen's first work on the trust and estate planning matters. Whalen met with Charles, Herb, Allen, and Wilfred and explained the amendments to the trust and the new deed needed to reflect Charles' desire to include Herbert as a trustee. The instrument amending the trust was signed on June 10, 1975, by Charles, Allen, and Herb, and later by Wilfred.

At the time the trust was amended, Whalen believed Herb knew the duties of a trustee because he had been with Charles on many occasions and because he was a real estate owner, appraiser, and expert witness in condemnation cases. Charles had told Herb about the trust before it was amended, and Herb received copies of the amended documents that had been signed on June 10, 1975. Whalen believed Charles understood the trust and the amendment. Whalen believed Allen and Wilfred had been operating as trustees for 13 years. On many occasions, Charles told Whalen he wanted the trust kept secret because he feared the reaction from Herb's brothers and sisters. Charles instructed Whalen not to record the deeds until after his death. Allen and Herb were also aware that Charles wanted to keep the trust secret.

After the trust was amended, Charles' mental and physical condition deteriorated. In the fall of 1976, Whalen wrote Herb, Allen, and Wilfred, asking them to schedule an appointment to discuss the trust and Charles' affairs. Whalen was considering what would need to happen if Charles became incompetent. The trustees did not come to see Whalen prior to Charles' death. Charles entered the hospital in 1978 and remained there until he died in April 1979.

Whalen recorded the deeds to the trust land after Charles died. Allen and Herb farmed the land from 1980 until August 1982. They received $69,000 in income. Suit was filed by Charles' other heirs in August 1980. In his deposition in the trust lawsuit, Allen stated that he, Herb, and Wilfred had done nothing as trustees before Charles died and that he did not think the trust took effect until after Charles' death, even though Allen had been a named trustee and had worked the land for 18 years. The trial court invalidated the trust in February 1981, finding that Charles treated the land as if it were his own, that the trustees denied doing any acts as trustees, and that the trustees testified that Charles intended the trust to arise after his death, when their duties would begin. See *Pizel v. Pizel*, 7 Kan. App. 2d at 396.

Under the trust agreement drafted by Zuspann in 1962, 1,760 acres of land were transferred to Charles, Wilfred, and Allen as trustees. Charles was entitled to income from the land during his life and was required to pay taxes on it. The income from the land, which consisted of crops and agricultural program payments, averaged $3,590.55 per year from 1962 to 1978. When Charles died, two trusts would be created—one for Wilfred and one for Allen. Neither Allen nor Wilfred had the right to demand a distribution from the trust, and only a disinterested trustee, in his uncontrolled discretion, could approve such a transfer. When Allen and Wilfred died, their children would receive the property of their trusts *per stirpes*. If neither had children, the assets returned to the intestate heirs of Charles.

Whalen prepared an amendment to the trust that was executed on June 10, 1975. It substituted Herb for Charles as a trustee and created three trusts, instead of two, upon Charles' death. Other substantive provisions of the trust were not changed.

Plaintiffs called Robert Groff, a Topeka lawyer, as an expert witness. He testified that, during Charles' lifetime, the deed to the trust should have been recorded or the deed should have been delivered to someone other than the lawyer, tax returns should have been filed for the trust, and accounts should have been established at banks and grain elevators in the trust's name. According to Groff, a lawyer who sets up a trust has an ongoing duty to see that the trust is functioning properly. The trust agreement can be viewed as a contract where Allen, Wilfred, and then Herb agreed to care for the property as stated in the agreement. Whalen's representation of Charles would potentially conflict with the interests of Herb, Allen, and Wilfred. Groff agreed that the testimony of the trustees regarding their belief that no trust existed prior to Charles' death was considered by the Court of Appeals in affirming the decision finding the trust did not exist.

Another lawyer, Donald Horttor, testified on behalf of defendants. Horttor believed Zuspann had acted properly when preparing and executing the trust in 1962. According to Horttor, unless a client asks questions, a lawyer can assume the client understands documents he or she is asked to read and sign. Horttor noted that a lawyer's correct creation of a trust can still be invalidated if the creator does not follow through. Horttor also noted that the lawyers represented Charles and not Allen and Wilfred. A potential conflict of interest existed between the grantor, Charles, and the trustees. The defendants also called Professor John Kuether of Washburn Law School as an expert witness. He expressed his opinion that the decision in *Pizel* changed prior law that had indicated an attorney could rely on a statement in the trust document to establish the trust's intent. Professor Kuether concluded Whalen had no direct duties to Herb, Allen, and Wilfred as trustees because of the potential conflict with his duties to his client, Charles. Additional facts will be mentioned where necessary to determine the issues raised in this appeal.

We first consider whether the trial court erred in granting Zuspann's motion for summary judgment. In granting the summary judgment motion, the trial court made the following additional findings of fact. In September 1975, Zuspann and Whalen dissolved their law partnership and Zuspann left the firm. The

deeds and trust instruments remained with Whalen. On January 11, 1979, Whalen prepared a codicil to Charles' last will and testament, which was executed that day. This added Herb as a beneficiary to the will to receive certain livestock and farm equipment. Charles died April 24, 1979.

The court also found no evidence that Zuspann did legal work for Charles from September 1975 until Charles' death in April 1979. After Charles' death, the deeds were recorded. The residuary beneficiaries under Charles' will challenged the validity of the inter vivos trust. The trial court and the Court of Appeals held that no valid inter vivos trust existed because the deeds to the trust were never recorded, nor put beyond the control of the grantor, and because the grantor was the only person who dealt with the land during his lifetime and never took any steps to indicate that a trust existed. *Pizel v. Pizel*, 7 Kan. App. 2d at 396-97.

The trial court concluded that appellants failed to state a legal malpractice claim against Zuspann because he had ceased to represent Charles and was replaced by other counsel before the opportunity to activate the inter vivos trust ended. The court noted that this legal malpractice claim involved the failure to advise the trustees of their duties, the failure to record a deed or otherwise put the deed out of the control of the grantor, and the failure to advise the client of the necessity of having the trustees take control of the trust res during Charles' lifetime if a valid trust existed, including filing tax returns in the name of the trust. Any of these events could have occurred at any time between Zuspann's departure from the law practice in September 1975 until Charles' death in April 1979. During this time, Charles was represented concerning his estate by attorney Whalen. The court stated:

"This is particularly so since the deeds and Trust instruments had in effect become a part of the legal file of B. E. Whalen, not one of the files which Zuspann took with him upon his departing the law practice in 1975. In effect, Zuspann resigned and Whalen took over during a period of time when no damage had occurred and no cause of action had accrued."

To support its decision, the trial court relied upon *Knight v. Myers*, 12 Kan. App. 2d 469, 748 P.2d 896 (1988). In that case, when the Laukalas sued the Knights for nuisance, the Knights

filed, among other things, a pro se "countersuit." Subsequently, the Knights hired attorney Myers to represent them. Myers failed to obtain proper service on the "countersuit" and it was eventually dismissed. Myers terminated his employment with the Knights on December 1, 1981, and formally withdrew from the two cases in which he represented the Knights on December 14, 1981. Within the next year and a half, the Knights were represented by at least two other attorneys. At the time Myers withdrew, the Knights probably had until July 8, 1983, to file their countersuit before the statute of limitations ran. The court concluded that Myers could not be held liable for failing to file an action prior to the expiration of the statute of limitations because he had ceased to represent the Knights and was replaced by other counsel before the statute ran. 12 Kan. App. 2d at 477.

Although this action did not involve failing to file a particular kind of lawsuit before the statute of limitations ran, the trial court found the holding in *Knight v. Myers* controlled. Zuspann's resignation from the law firm in September 1975 and Whalen's assumption of activity on the file, in effect, resulted in Zuspann's withdrawal from representation of Charles. Steps needed to assure creation of the inter vivos trust were possible until Charles' death in April 1979.

We do not agree with the trial court that *Knight* is analogous to the present case, nor do we find it controlling. As appellants correctly note, this case is distinguishable from *Knight v. Myers* because, to carry out the terms and conditions of his employment during his representation of Charles, Zuspann had a continuing duty to assure that Charles' intent to pass the land to his nephews was realized. Zuspann's alleged failure to adequately advise Charles of the steps needed to effectuate the trust constituted a special obligation that was continuous in nature and that resulted in injury to Charles and his intended third-party beneficiaries. More importantly, in *Knight*, attorney Myers committed no act of negligence prior to terminating his representation of Knight. The attorneys who subsequently represented Knight had ample opportunity to file the action prior to the expiration of the statute of limitations. The only act of negligence was by the subsequent attorneys for failing to file the action in time. In the instant case, plaintiffs allege various acts of negligence by both Zuspann and

Whalen. The mere fact that Whalen subsequently represented Charles does not relieve Zuspann of liability for his acts of negligence prior to the termination of his attorney-client relationship with Charles. The fault of each attorney, if any, is for the jury to determine and compare. *Knight* does not apply to the facts in the present case.

" 'Summary judgment is proper where the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Knight v. Myers*, 12 Kan. App. 2d at 475 (quoting *Peoples Nat'l Bank & Trust v. Excel Corp.*, 236 Kan. 687, Syl. ¶ 5, 695 P.2d 444 [1985]). In reviewing a motion for summary judgment that has been granted by the trial court, the appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. *Danes v. St. David's Episcopal Church*, 242 Kan. 822, 830, 752 P.2d 653 (1988). The record here does not support the trial court's findings and conclusions of law that justify the granting of Zuspann's summary judgment motion. The fact that Zuspann ceased to represent Charles three and a half years prior to Charles' death, and that Whalen subsequently conducted additional work on the case, including modifications of both the trust and the will, does not relieve Zuspann from liability for a claim of legal malpractice. The trial court erred in granting Zuspann's motion for summary judgment. In view of our decision on this issue, we need not address the other issues raised by plaintiffs.

In the first of three issues raised in his cross-appeal, appellee Whalen argues that this court should decline to allow a nonclient to sue a lawyer in tort for conduct by the lawyer in the attorney's representation of the client. In *Young v. Hecht*, 3 Kan. App. 2d 510, 514, 597 P.2d 682, *rev. denied* 226 Kan. 793 (1979), the Kansas Court of Appeals stated: "An attorney cannot, in the absence of special circumstances, be held liable for the consequences of his professional negligence to anyone other than his client. See generally Annot., 45 A.L.R.3d 1181."

In *Nelson v. Miller*, 227 Kan. 271, 289, 607 P.2d 438 (1980), this court held that an attorney cannot be held liable for the

consequences of the attorney's professional negligence to an adversary of his or her client. Traditionally, an attorney will be held liable for negligence only to a client. This rule is based upon the rationale that privity of contract must exist between the plaintiff and the attorney to support an action for professional negligence. 227 Kan. at 286-87. The strict requirement of privity of contract, however, has been eased when an attorney renders services that the attorney should have recognized as involving a foreseeable injury to a third-party beneficiary of the contract. These cases usually involve the negligence of attorneys in drafting a will or examining real estate titles. 227 Kan. at 287.

Appellee Whalen argues that this court should not change Kansas law to recognize a cause of action in negligence for the potential beneficiaries of the Charles Pizel trust because such a duty is not justified under these facts and would be unduly burdensome. An attorney is obligated to a client "to use reasonable and ordinary care and diligence in the handling of cases he undertakes, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other attorneys in his community." *Bowman v. Doherty*, 235 Kan. at 878. Whalen recognizes that the modern trend is to expand an attorney's duty to include persons not in privity with the attorney-client contract. 1 Mallen and Smith, Legal Malpractice § 7.11, p. 381 (3d ed. 1989). Two principal theories have been used to recognize a duty in such cases. The first was developed in a series of cases in California and is called a multicriteria balancing test. The second is the more traditional concept of the ability of a third-party beneficiary of a contract to recover.

According to the pretrial order, here appellants were proceeding under two theories: breach of contract and/or negligence. Both arose from attorney Whalen's failure to take the steps necessary to create a valid inter vivos trust on behalf of Charles. No one disputes that appellants were the intended beneficiaries of the trust. Under the contract action, appellants alleged that they should be considered either clients of Whalen or third-party beneficiaries of the lawyer-client relationship between Charles and Whalen.

The instructions to the jury submitted the case on the theories of both contract and negligence. The jury was asked to answer

two specific questions in the verdict form prior to assessing fault percentages or damages. First, the jury was asked: "Do you find the Defendant B.E. Whalen breached his contract with Charles Pizel and that the plaintiffs were third-party beneficiaries of that contract?" The jury answered this question in the negative. Second, the jurors were asked: "Do you find any of the parties to be at fault?" In response to this question, the jury answered yes. Thus, it appears the jury rejected the contract theory but did find negligence.

Appellants did not establish an attorney-client relationship with Whalen. Whalen held this relationship with Charles, but not Charles' nephews. Therefore, we must determine whether nonclients can recover on a claim of legal malpractice. Allowing a nonclient to recover from an attorney for legal malpractice as a third-party beneficiary is based upon traditional contract principles. In nearly all American jurisdictions, "a third person may, in his own right and name, enforce a promise made for his benefit even though he is a stranger both to the contract and to the consideration." 17 Am. Jur. 2d, Contracts § 302, p. 722. Although this was originally an exception to the rule that no claim can be sued upon contractually unless a contract exists between the parties, it is now so generally recognized that it is viewed as an affirmative rule subject to limitations and exceptions. *Anderson v. Rexroad,* 175 Kan. 676, 266 P.2d 320 (1954); 17 Am. Jur. 2d, Contracts § 302, p. 722.

This court recognized in *Nelson v. Miller,* 227 Kan. at 287, that the rule requiring privity of contract to hold an attorney liable for legal malpractice has been relaxed in will drafting and examination of real estate titles. This suggests a recognition of a third-party beneficiary theory in appropriate cases. But here, the jury found that Whalen did not breach his contract with Charles and that the appellants were not third-party beneficiaries. We must therefore decide whether to allow nonclients to recover under a legal duty owed directly to the nonclient. California has adopted such a theory, utilizing a multi-criteria balancing test. Although it is viewed as a separate theory, its criteria are closely related to the analysis and policy reasons used to justify permitting a third-party beneficiary to recover in a contract action.

The California Supreme Court first addressed the multi-criteria balancing test in *Biakanja v. Irving*, 49 Cal. 2d 647, 320 P.2d 16 (1958), which challenged the validity of a will. A notary public, who was not an attorney, prepared a will for a testator. The will was later found invalid due to the notary's negligence. The court concluded that the notary had a duty to the sole beneficiary to exercise due care. Because the defendant notary's negligence was the direct cause of the plaintiff beneficiary's loss, in addition to defendant's engaging in the unauthorized practice of law, the beneficiary would be permitted to recover her loss from the defendant even though the beneficiary and defendant were not in privity of contract. In explaining why recovery should be allowed in that case, the court listed the following criteria:

"The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm. (*Cf.*, Prosser, Torts (2d ed. 1955), §§ 36, 88, 107, pp. 168, 172, 544-545, 747; 2 Harper and James, Torts (1956), § 18.6, p. 1052.)" 49 Cal. 2d at 650.

Next, the California Supreme Court held, in *Lucas v. Hamm*, 56 Cal. 2d 583, 15 Cal. Rptr. 821, 364 P.2d 685 (1961), that liability should be extended to beneficiaries who were injured by a will negligently drafted by an attorney. Listing an additional factor to be balanced in such cases, the court reasoned such extension did not place an undue burden on the profession because, otherwise, the innocent beneficiary would have to bear the loss. 56 Cal. 2d at 589.

In *Heyer v. Flaig*, 70 Cal. 2d 223, 74 Cal. Rptr. 225, 449 P.2d 161 (1969), daughters of the deceased filed an action against an attorney for negligently failing to fulfill testamentary directions of his client, the deceased. In discussing whether a third party could recover against an attorney on a theory of tort liability for a breach of duty owed directly to the third party, the court stated:

"When an attorney undertakes to fulfill the testamentary instructions of his client, he realistically and in fact assumes a relationship not only with the client but also with the client's intended beneficiaries. The attorney's

actions and omissions will affect the success of the client's testamentary scheme; and thus the possibility of thwarting the testator's wishes immediately becomes foreseeable. Equally foreseeable is the possibility of injury to an intended beneficiary. In some ways, the beneficiary's interests loom greater than those of the client. After the latter's death, a failure in his testamentary scheme works no practical effect except to deprive his intended beneficiaries of the intended bequests. Indeed, the executor of an estate has no standing to bring an action for the amount of the bequest against an attorney who negligently prepared the estate plan, since in the normal case the estate is not injured by such negligence except to the extent of the fees paid; only the beneficiaries suffer the real loss. We recognized in *Lucas* that unless the beneficiary could recover against the attorney in such a case, no one could do so and the social policy of preventing future harm would be frustrated.

"The duty thus recognized in *Lucas* stems from the attorney's undertaking to perform legal services for the client but reaches out to protect the intended beneficiary. We impose this duty because of the relationship between the attorney and the intended beneficiary; public policy requires that the attorney exercise his position of trust and superior knowledge responsibly so as not to affect adversely persons whose rights and interests are certain and foreseeable.

"Although the duty accrues directly in favor of the intended testamentary beneficiary, the scope of the duty is determined by reference to the attorney-client context. Out of the agreement to provide legal services to a client, the prospective testator, arises the duty to act with due care as to the interests of the intended beneficiary. We do not mean to say that the attorney-client contract for legal services serves as the fundamental touchstone to fix the scope of this direct tort duty to the third party. The actual circumstances under which the attorney undertakes to perform his legal services, however, will bear on a judicial assessment of the care with which he performs his services." 70 Cal. 2d at 228-29.

Thus, the court concluded that the intended beneficiaries of the deceased's will could recover for legal malpractice under a duty the attorney owed directly to them. In *Bucquet v. Livingston,* 57 Cal. App. 3d 914, 922, 129 Cal. Rptr. 514 (1976), the court found no rational basis for distinguishing inter vivos trusts and applied the principles set forth in *Heyer v. Flaig,* 70 Cal. 2d 223, to intended beneficiaries of such trusts.

Relying upon the analysis from the California courts, the Arizona Court of Appeals concluded that an attorney can be held liable to a third person not in privity if a duty arises based upon the balancing of the various factors listed in the California cases.

*Fickett v. Superior Court of Pima County*, 27 Ariz. App. 793, 795-96, 558 P.2d 988 (1976).

Not all courts have adopted the balancing test developed by the California courts. The Supreme Court of New York refused to recognize a duty owed by attorneys who prepared decedents' wills and assisted the executor in *Kramer v. Belfi*, 106 App. Div. 2d 615, 482 N.Y.S.2d 898 (1984). The beneficiaries alleged the attorneys negligently failed to advise the executor to renounce the trust created in the will of the deceased wife, which caused severe tax consequences to the deceased husband's estate. The court found defendant attorneys were entitled to dismissal of all causes of action brought by all plaintiffs except for the plaintiff who sued in his capacity as executor of the decedents' estates. The court stated: "Defendants were retained by the executor only and are not liable to the beneficiaries of the decedents' estates in the absence of fraud, collusion, or malice, none of which is alleged here." 106 App. Div. 2d at 616.

We find the California cases persuasive. We conclude that an attorney may be liable to parties not in privity based upon the balancing test developed by the California courts. Applying that test to the present case, appellants' claim would state a cause of action against Whalen under a theory of negligence, based on the following factors:

(1) The extent to which the transaction was intended to affect the plaintiffs: Appellants here were the intended beneficiaries of the inter vivos trust. Upon Charles' death, the property of the trust was to be divided equally among the beneficiaries and held in trust until their deaths, at which time it would pass to their heirs *per stirpes*.

(2) The foreseeability of harm to the plaintiffs: Appellants were the intended beneficiaries of the trust. If the inter vivos trust failed, their inheritance from Charles would be limited to the provisions of the will, which did not mention the trust.

(3) The degree of certainty that the plaintiffs suffered injury: Because the inter vivos trust was found to be invalid, the property that was intended for the trust passed through the residuary clause of Charles' will.

(4) The closeness of the connection between the attorney's conduct and the injury: Although Whalen did not draft the original trust, he did draft an amendment to it that included Herb as a trustee. He also took over as the attorney for Charles for several years while the trust was supposedly in operation.

(5) The policy of preventing future harm: If the intended beneficiaries of the inter vivos trust here are not allowed to pursue a negligence claim against the attorneys who drafted the trust and its amendments, then the beneficiaries will have no avenue of recovery.

(6) The burden on the profession of the recognition of liability under the circumstances: The trial court here correctly instructed the jury that a lawyer is negligent if he does not use the degree of care and skill which a reasonably competent attorney would use in similar circumstances. The legal profession will not be unduly burdened by requiring a lawyer to act in a reasonably competent manner in the representation of his or her clients.

The trial court allowed the case to proceed against Whalen on the theory of legal malpractice based upon negligence. Appellants, as intended beneficiaries, meet the six factors listed above and are therefore entitled to bring this cause of action. The trial court properly allowed the case to proceed upon this theory.

In responding to appellants' argument that the verdict was contrary to the evidence and rendered as a result of passion or prejudice, Whalen addresses the issue of whether the negligence of the appellants and others can be compared with that of the defendants. Whalen notes that, throughout the case, he took the position that the failure of the inter vivos trust was the result of the fault of appellants and Charles in not reading the trust document and dealing with the real property as required by those documents or in appellants' failing to consult with their own attorney to determine those actions they should take as trustees or as potential beneficiaries of the trust. Whalen has also argued that the fault of Charles should be imputed to the appellants. This contention will be addressed later in this opinion.

This court has never specifically discussed whether the fault of a client can be apportioned in a legal malpractice suit. In *Bowman*

*v. Doherty*, 235 Kan. 870, 686 P.2d 112 (1984), this court addressed the damages that could be recovered in a legal malpractice action alleging negligence on behalf of the attorney. The jury in that case found both the client and the attorney negligent and assessed 30% of fault to the client, 50% to the attorney, and 20% to a phantom party. In *Bowman*, this court concluded that the trial court erred in granting partial summary judgment by ruling that the attorney's inaction in failing to actively represent his client in a criminal matter was wanton. The court noted that reasonable minds could differ on whether the attorney acted in a wanton manner, and therefore a question of fact was created which should have been submitted to the jury. Furthermore, the jury should have been given the opportunity to determine whether the negligent deprivation of the client's freedom caused him to suffer an injury involving mental distress. 235 Kan. at 877-78.

In *Bowman*, this court held that the trial court did not err in failing to reduce the punitive damages by the percentages of fault attributable to the parties. Punitive damages are imposed to deter others from committing similar wrongs. In this way, punitive damages punish the wrongdoer and do not compensate for the wrong. Comparative negligence focuses on the harm suffered and the proportionate fault of all the parties to the occurrence. Different considerations are involved in assessing punitive damages to punish the wrongdoer and in awarding an amount to assure that the injured party receives proper compensation. 235 Kan. at 880-82.

Although this court did not specifically address the question in *Bowman*, the court gave no indication in its decision that it was improper for the trial court to instruct the jury to compare the fault of the client with that of the attorney. Other jurisdictions that have considered the matter have allowed the negligence of the client to be considered in comparing fault. In *Becker v. Port Dock Four, Inc.*, 90 Or. App. 384, 752 P.2d 1235 (1988), the Oregon Court of Appeals concluded that a comparative fault defense should be available in legal malpractice cases. The court noted as follows:

"Legal malpractice *is* a form of negligence. In other negligence contexts, findings of comparative fault can be based on the plaintiff's failure to take

reasonable measures which might have prevented or reduced the injury caused by the defendant's negligence. We discern no convincing reason why that should not be true in this context." 90 Or. App. at 390.

Although the court recognized that in some cases a client possibly could not be contributorily negligent as a matter of law, the case before the court involved an alleged omission by the plaintiffs in failing to read a document before signing it and, as a possible result, neglecting to call to the attention of the lawyer the fact that data important to and within plaintiffs' knowledge was omitted. The court recognized that the plaintiffs were in as good a position as the attorney to know that something was missing. 90 Or. App. at 390-91. In an attorney malpractice case involving a marital dissolution procedure, the Minnesota Court of Appeals indicated the trial court did not err in giving a comparative negligence instruction stating the client must use reasonable care to protect her own financial interests given the information made known to her. *Bowen v. Arnold*, 380 N.W.2d 531, 536 (Minn. App. 1986).

We conclude that comparative fault principles apply to a legal malpractice action based upon negligence unless as a matter of law the client had no obligation to act on the client's own behalf. Therefore, the trial court here correctly instructed the jury to compare the fault of the parties. The evidence would support the finding by the jury that the trustees here should have taken steps based upon their knowledge of real estate and the existence of the trust to manage the property that was contained within the trust.

Whalen next argues that the negligence of his client, Charles, should be imputed to the appellants. The trial court rejected defendants' requested instruction on this theory. Although recognizing that the general rule is that the negligent acts of third persons will not be imputed to a plaintiff to bar recovery, Restatement (Second) of Torts § 485 (1964), Whalen argues that the exception to this general rule for a joint enterprise should be applied to the facts in this case.

Four basic elements are needed to establish a joint venture that imposes vicarious liability: (1) an agreement; (2) a common purpose; (3) a community of interest; and (4) an equal right to a voice accompanied by an equal right of control over the instru-

mentality. *Scott v. McGaugh*, 211 Kan. 323, 327, 506 P.2d 1155 (1973).

In *Schmidt v. Martin*, 212 Kan. 373, 375-76, 510 P.2d 1244 (1973), this court recognized that the doctrine of imputed negligence has been highly criticized. The court pointed out that the doctrine has been rejected in five recognized relationships in Kansas: (1) parent and child; (2) husband and wife; (3) driver and passenger; (4) owner of vehicle and driver; and (5) bailor and bailee. The court has approved and accepted the doctrine when applied in two special relationships: master-servant and joint enterprise. 212 Kan. at 376. In *Schmidt*, the court had to decide whether to impute the negligence of a custodian of a child to the child's parents as a matter of law based solely on that relationship. 212 Kan. at 376. The court rejected its application, holding that the negligence of a third party in caring for a child at the request of the parent is not, as a matter of law, imputed to the parent. The court pointed out that the only logical basis for the imputation of the negligence of one person to another is the right of the latter to control the acts of the former. 212 Kan. at 378.

In *Lightner v. Frank*, 240 Kan. 21, 24-27, 727 P.2d 430 (1986), this court once again addressed the issue of imputed negligence. This was a wrongful death action by the children of a married couple involved in an extensive farming operation. The wife was driving at the time of the automobile crash. The question was whether her negligence could be imputed to her husband. This court concluded that the record was completely lacking in any testimony that an agreement or understanding existed between the husband and wife to the effect that the husband had a right to control the wife's operation of the automobile.

The four basic elements necessary to establish a joint venture to impose vicarious liability do not exist here. Whalen argues that the trust was an agreement between appellants and Charles. The trust, however, was created by the unilateral actions of Charles. Although Allen, Wilfred, and Herb agreed to act as trustees, the creation and continuation of the trust was solely within the power and conduct of Charles. Certainly no prior agreement or understanding existed among the parties to create

the trust; therefore, the first requirement necessary to establish a joint venture is not shown.

The court here instructed the jury to compare the faults of the parties. The jury apportioned fault as follows:

| | |
|---|---|
| Allen Pizel | 12% |
| Herbert Pizel | 12% |
| Wilfred Pizel | 11% |
| Charles Pizel | 25% |
| Eugene Zuspann | 5% |
| B.E. Whalen | 35% |

If Whalen's argument was accepted and the fault of Allen and Herb as well as Charles was imputed to each other, then the total fault of appellants would be 60%. Under the comparative fault principles adopted in Kansas, because the fault of those parties is greater than 50%, no judgment would have been entered against Whalen. See *Pape v. Kansas Power & Light Co.*, 231 Kan. 441, 448-49, 647 P.2d 320 (1982). Because Whalen has not established that the trust here should be treated as a joint venture, however, this argument must be rejected. The trial court's instructions on comparative fault, which did not impute the negligence of the appellants to each other and Charles, were correct.

Finally, Whalen contends that appellants' tort claim is barred by the statute of limitations. This court has recognized that legal and medical malpractice generally constitutes both a tort and a breach of contract. In *Bowman v. Doherty*, 235 Kan. at 879, this court noted that, usually, an action for liability of an attorney on the grounds of negligence in the discharge of the attorney's professional duty to a client rests on an employment contract, making it contractual in nature. In *Bowman*, this court stated:

"Where the act complained of is a breach of specific terms of the contract without any reference to the legal duties imposed by law upon the relationship created thereby, the action is contractual. Where the gravamen of the action is a breach of a duty imposed by law upon the relationship of attorney/client and not of the contract itself, the action is in tort. *Chavez, Executrix v. Saums*, 1 Kan. App. 2d 564, 571 P.2d 62 (1977)." 235 Kan. at 879.

The instant case was submitted to the jury on both theories. The jury found no breach of contract, rejecting appellants' claim

that they could recover as third-party beneficiaries. The basis of the jury's verdict was negligence. To show that this action was filed in a timely manner, appellants must establish that the claim was filed within two years of the time in which it accrued. K.S.A. 1989 Supp. 60-513.

In the pretrial order, the trial court held that appellants suffered no substantial damage until after the death of Charles. Citing *Price, Administrator v. Holmes*, 198 Kan. 100, 422 P.2d 976 (1967), the trial court held that the statute of limitations was tolled until the Kansas Supreme Court denied the petition for review in *Pizel v. Pizel*, which occurred on June 28, 1982. The lawsuit here was filed on June 26, 1984, within two years of the denial of the petition for review.

All parties argue that the holding in *Price* supports their respective positions. Weber, the decedent in *Price*, had asked Holmes, a banker but not a lawyer, to prepare a will, leaving one-half of his estate to his wife and the other half to his niece, Lillian Price. The will was drafted and signed. Upon decedent Weber's death, the will was offered and admitted to probate, but on appeal the Kansas Supreme Court reversed the judgment admitting the will to probate and held the will to be void. *In re Estate of Weber*, 192 Kan. 258, 387 P.2d 165 (1963). Lillian Price died while the appeal was pending, 12 days before the decision of the district court was reversed.

Von T. Price was appointed as Lillian's administrator. He sued Holmes, the banker, based upon his improper drafting of the will. The cause of action was pled alternatively for breach of contract, based upon an implied warranty, and tort, based upon negligence. The case was dismissed by the district court on a motion for summary judgment. On appeal, the Supreme Court first ruled that any cause of action against Holmes for negligence accrued when the will was declared void by the Kansas Supreme Court on December 7, 1963. Prior to the Supreme Court's decision, the will had been held valid by two courts; therefore, Lillian suffered no damage until the will was held invalid. *Price*, 198 Kan. at 105. Because Lillian Price was not alive at the time the Supreme Court found the will invalid, however, her cause of action in tort did not survive her death. Therefore, a cause of

action based upon negligence did not survive and could not be pursued against Holmes.

A cause of action for breach of contract accrues when a contract is breached by the failure to do the thing agreed to, irrespective of any knowledge on the part of the plaintiff or of any actual injury it causes. *Price*, 198 Kan. at 106 (quoting *Crabb v. Swindler, Administratrix*, 184 Kan. 501, 507, 337 P.2d 986 [1959]). Because Weber's will was executed more than three years before the action was commenced in *Price*, the question arose whether the statute was tolled by the pendency of proceedings to contest the will. The court concluded that Lillian Price could not sue Holmes under any theory until the will had been offered for probate and found to be invalid. *Price*, 198 Kan. at 107.

In reaching this conclusion, the court in *Price* quoted the following general rule set out in *Newcom, Administrator v. Potterf*, 182 Kan. 73, Syl. ¶ 1, 318 P.2d 1069 (1957), and *In re Estate of Brasfield*, 168 Kan. 376, Syl. ¶ 7, 214 P.2d 305 (1950):

" 'The rule in this jurisdiction is that if a person is prevented from exercising his legal remedy by the pendency of legal proceedings, the running of the statute of limitations applicable to the remedy is postponed, or if it has commenced to run, is suspended or tolled, during the time the restraint incident to the proceedings continues.' " *Price*, 198 Kan. at 107.

These cases involve a delay in the appointment of an administrator due to protracted litigation and the effect such a delay has upon a creditor's right to file his claim versus an administrator's right after appointment to recover estate property. Appellants argue that, under the rule as stated in *Brasfield* and adopted again in *Price*, the cause of action here either was *tolled* by the continuing appeal of the district court decision voiding the trust, or did not *accrue* until the Kansas Supreme Court denied the petition for review in *Pizel v. Pizel* on June 28, 1982.

Appellee Whalen distinguishes *Price* from the facts involved here and argues that it should not bar the statute of limitations defense. First, Whalen notes that the action that survived in *Price* was based upon contract because the tort claim did not survive the death of Lillian Price. Here, the action is based upon negligence. The statute of limitations in *Price* was not tolled, but the cause of action did not accrue until the Supreme Court found the will void. Under this approach, Whalen argues that this cause

of action accrued February 13, 1981, when Charles' inter vivos trust was first set aside by the trial court.

Appellee Zuspann argues that early decisions by this court require a finding that the statute of limitations here accrued on February 13, 1981, when the trial court found the trust invalid. In *State v. Alexander*, 84 Kan. 393, 114 Pac. 241 (1911), a defendant was convicted of the unlawful sale of intoxicating liquor. His conviction was appealed and an appeal bond was filed. The Supreme Court affirmed defendant's conviction. Meanwhile, the State did not seek to enforce a lien upon the premises where the liquor had been sold until after the statute of limitations had run. The court concluded that an ordinary appeal or stay bond would suspend the right to issue execution against the convicted party, but did not suspend or impair the lien which upon conviction attached to the property by virtue of the statute. Zuspann also directs this court's attention to *Delay v. Yost*, 59 Kan. 496, 53 Pac. 482 (1898), where a judgment was obtained and appealed with no supersedeas bond being given. The court concluded that the appeal was no obstacle to a commencement of an action to obtain a writ of replevin.

All parties discuss the decision of *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 716 P.2d 575 (1986), which involves a question of whether the statute of limitations barred a legal malpractice claim. The plaintiff filed an action against its former attorneys, who had represented the plaintiff corporation for about 20 years. Those attorneys chose to represent individual interests of certain stockholders of the corporation against the corporate client after the death of one of the two principal stockholders. Plaintiff argued that defendant's filing of a lawsuit against plaintiff was malicious in nature, negligent, a breach of fiduciary duty, and a breach of implied contract. Plaintiff argued that the statute of limitations was tolled as long as the litigation involving the stockholders was pending. The court noted that, although plaintiff used the concept of tolling of the statute of limitations in stating its claim, it was actually arguing that its suit for malpractice did not accrue until it suffered substantial damages. The defendant attorneys argued that the cause of action accrued when the suit by the individual shareholders was filed against plaintiff and that the statute of limitations began to run at that time.

This court noted that, generally, a cause of action accrues when the right to maintain a legal action arises. Thus, the statute of limitations begins to run at that point in time when plaintiff could first have filed and prosecuted his action to a successful conclusion. 239 Kan. at 87 (citing *Johnston v. Farmers Alliance Mutual Ins. Co.*, 218 Kan. 543, 548, 545 P.2d 312 [1976]; *Yeager v. National Cooperative Refinery Ass'n*, 205 Kan. 504, 470 P.2d 797 [1970]). The court outlined four theories that can apply to attorney malpractice in Kansas to determine when the accrual of a cause of action occurs and the statute of limitations begins to run. Depending upon the facts and circumstances of each case, these four theories include:

"(1) The occurrence rule—the statute begins to run at the occurrence of the lawyer's negligent act or omission.

"(2) The damage rule—the client does not accrue a cause of action for malpractice until he suffers appreciable harm or actual damage as a consequence of his lawyer's conduct.

"(3) The discovery rule—the statute does not begin to run until the client discovers, or reasonably should have discovered, the material facts essential to his cause of action against the attorney.

"(4) The continuous representation rule—the client's cause of action does not accrue until the attorney-client relationship is terminated.

For cases discussing all four points see Annot., 32 A.L.R.4th 260; ABA/BNA Lawyers' Manual on Professional Conduct § 301:901 (1985); Mallen and Levit, Legal Malpractice § 388 *et seq.* (2d ed. 1981)." 239 Kan. at 87.

We concluded in *Pancake House* that the cause of action accrued upon the filing of the journal entry of judgment in the district court. No appeal was taken from that judgment.

Arguably, the negligence of Zuspann occurred on May 23, 1962, when the trust, will, and deed that he had prepared were signed. Whalen's negligence occurred on June 10, 1975, when the first amendment to the trust and the second deed were signed, or on January 11, 1979, when the codicil was signed. None of these events, however, triggered the running of the statute of limitations because substantial injury had not occurred and, therefore, no cause of action arose. Similarly, a cause of action did not arise with Charles' death on April 24, 1979, because, at that time, appellants had not suffered any injury. In *Roe v. Diefendorf*, 236 Kan. 218, 222, 689 P.2d 855 (1984), this court held that the term "substantial injury" in K.S.A. 1989 Supp. 60-513(b) means that

the injured party must have sufficient ascertainable injury to justify an action for recovery of damages. Therefore, the occurrence of the negligence here was not the appropriate time for accrual of the cause of action.

Under the damage theory, no injury occurred until the trust was declared invalid by the trial court on February 13, 1981. See *Price*, 198 Kan. at 107. It was at that point in time that appellants suffered substantial injury. Absent tolling of the statute of limitations, the cause of action filed June 24, 1984, was not filed in a timely manner. However, as the trial court correctly held, based upon the rationale of *Price*, the statute of limitations was tolled until this court denied the petition for review on June 28, 1982. The plaintiffs were effectively precluded from bringing this action against Zuspann and Whalen until a final determination was made on the appeal. Until that final determination was made, the plaintiffs could have filed, but not prosecuted, this action to a successful conclusion. In the event the Court of Appeals or this court would have reversed the trial court, the plaintiffs would have had no cause of action against Zuspann or Whalen.

We therefore conclude that the cause of action accrued February 13, 1981, when the trial court found the trust invalid but was tolled until June 28, 1982, when the petition for review, seeking to overturn the trial court's decision in *Pizel v. Pizel*, was denied.

Our reversal of the trial court's entry of summary judgment in favor of defendant Zuspann leaves us no option but to grant a new trial. Although the jury determined fault of all the parties, Zuspann was not a real party in interest. The trial court did not find that Zuspann was not negligent but, rather, that he was not liable for his negligence. The trial court permitted Zuspann to remain in the case for purposes of comparing fault. Zuspann did not participate in the trial as a real party defendant, with all that implies. He did not present evidence, cross-examine witnesses, or argue his case to the court and jury. Clearly, the trial strategy of the parties would not have been the same had summary judgment been denied Zuspann by the district court. Nor can we say with any degree of certainty what effect the change in Zuspann's status as a party would have had on apportionment of fault by the jury.

The judgment of the district court is reversed as to the plaintiffs' appeal and affirmed as to the defendants' cross-appeal. The case is remanded for a new trial.